CASE 60—PETITION ORDINARY—DECEMBER 17.

# Conley's Adm'r v. Cincinnati, New Orleans and Texas Pacific Railway Co.

### APPEAL FROM MERCER CIRCUIT COURT.

1. DUTY OF RAILROADS TO TRESPASSERS.—Where one is injured as the result of non-performance or violation by another of a plain and manifest duty for the protection of human life or safety, the party thus causing the injury will not be heard to say, in justification, that he was dealing with his own property, and that the person injured was, technically, a trespasser. This rule, however, does not apply if the injured party, knowing the existence of the danger, purposely or negligently put himself in the way.

To turn cars loose at night, to move by their own momentum, without an engine attached, and without a light in front to warn persons on the track of their approach, is negligence even as to a trespasser on the track.

2. RIGHTS TO RECOVER FOR WILLFUL NEGLECT.—An administrator who

sued in two counts for the killing of his intestate—in one for willful neglect, and in the other for gross and ordinary neglect—can not recover on the count for willful neglect, the intestate having left neither widow nor child.

THOMAS C. BELL FOR APPELLANT.

C. B. SIMRALL, DURHAM & JACOBS FOR APPELLEE.

No brief in record.

JUDGE BENNETT DELIVERED THE OPINION OF THE COURT.

The appellant, as administrator of Ed. Conley, sued the appellee in two counts for killing his intestate— one for willful, the other for gross and ordinary neglect. There is no allegation in either count of the petition that the intestate left either widow or child; besides, the proof shows that he left neither; therefore, according to the repeated decisions of this court recently rendered, the appellant can not recover on the count for willful neglect. The only question is, does certain evidence, as it appears in the record, if believed, authorize the appellant to recover for ordinary or gross neglect? Let us see. The appellant's intestate was killed almost immediately at Burgin depot, Mercer county, Kentucky, by the rear part of the appellee's stock train No. 10 running over him on January the 8th, 1883, about seven o'clock at night.

On behalf of the appellant, the evidence shows that while the said train was coming south, about seven o'clock at night, it being very dark, and a drizzling rain falling, said train was cut in two, probably about three-fourths of a mile from Burgin depot, and the front part of the train was drawn by the engine at a more rapid rate until it passed Burgin depot, and

stopped at the stock yard, and the rear part of the train, which included three box-cars and one caboose, ran at a slower rate by its own momentum—the grade being a down grade from the place of uncoupling nearly to the Burgin depot, from thence level to said depot—until it got almost to the said depot, when it stopped ; that the said rear part of the train was thus permitted to run without any light being placed or kept at the front end of it, but a light was at the rear end ; that no signal was kept on said rear part of the train ; that no person was stationed thereon in a position to look out for danger, and give warning or stop the train ; that the appellant's intestate was at the depot about the time the front part of the train passed it on its way to the stock yard ; that he boarded at the section-house, situated on the west side of the railroad track, and the depot was situated on the east side of it ; that there was a public crossing about fifty feet south of the depot, at which he could cross to go to the section-house, or he could cross by a pathway used principally by the section-house people, and thereby shorten the distance that he would have to go ; that said road and path crossed the track nearly at the same place ; that by the front part of the train blowing its whistle and passing the depot, the deceased, not being able to see the rear part of the train, there being no light front, and not hearing its silent approach, believed that the track was clear, and started to cross it, either at the public or private crossing, and while crossing was struck down and run over, or if not on either of said crossings, but on a private part of the track when struck, it was the

darkness of the night that caused him to miss his way, and the silent, undiscernible approach of the rear portion of the train that caused him not to hear or see it. On the other hand, the appellee's proof shows that it did not uncouple its train until it had passed the depot going north, and had arrived at the stock pens, at which place the train was uncoupled, and the rear portion permitted to run back to a point just south of the depot, where it stopped; that a light was on the rear part of the caboose, which light, by reason of said portion running back towards the south, was in front, and furnished sufficient light to enable the deceased or other persons on or near the track to easily discern the approach of said portion of the train; that the deceased, while trespassing on the track, either in attempting to cross just ahead of said train or while walking on the track, or attempting to cross by crawling under the train, in either case negligently failing to notice that the train was approaching, was killed.

It may be that the deceased was run over and killed while he was on the track, either walking on it or crossing it, not at a point where he had the legal right to be. If this be so, he was, technically, a trespasser, and only technically a trespasser. So the question is, did the fact that he was, technically, a trespasser, excuse the appellee, if the deceased was killed under the circumstances contended for by the appellant?

According to the appellant's contention, the appellee, having uncoupled its train on a dark night, without a light in front to warn persons, having occasion to be on the track, of its approach; without a lookout to warn

persons that might be on the track of danger, and powerless to discover such persons for the want of a light; without a person on the train to stop it in case of danger to such persons, or, if having the train in charge, unable to discover such danger for the want of light; and having suffered it to run up to its depot, situated in a town of a hundred and fifty or two hundred inhabitants, living on either side of the track, near the depot, and a public and private crossing near the same, and persons likely to be crossing the track in going to and from the depot at that hour, either for business or pleasure; also crossing in going to their respective homes from business pursuits; and as these persons, by seeing and hearing the main part of the train pass the depot, would naturally suppose that the way was clear, and would attempt to cross the track at the most convenient place of crossing, as is customary in towns of that size, without fear of evil; or, by reason of the darkness of night, might miss their way and cross at a point where there was no public crossing; that, under these circumstances, it was inexcusable negligence to thus turn said rear train loose to silently and unseen run down any person that might be crossing the track, whether or not at a crossing.

We recognize and repeat the rule, that the operators of a train are, ordinarily, under no obligation to look out for trespassers; that, as a rule, they have the exclusive right to their track, and have the right to presume that no person will trespass upon it, and are, therefore, under no obligation to look out for them. But this rule, as to looking out for such persons, has

its exceptions, one of which is, that where the train is running through a city or town, and the people thereof may cross the track at any and all hours at such points as may be convenient, whether public or not, and the operators have reason to know that such is the habit, it is their duty to look out for such persons, and take reasonable precaution not to run over them. In making approaches to these places, or going through them, they are required, not only to look out, but to ring the bell, &c., whether approaching a crossing or not. Why so? It is for the purpose of seeing persons in time not to injure them, and of warning them, whether trespassers or not, of the approach of the train, in order that they may get out of the way. This they are required to do, even in the bright daytime. If they fail to do this, it has been held, time and again, that such failure is actionable negligence. In this line is the case of Louisville & Nashville R. Co. v. Schuster, 10 Ky. Law Rep., 67; Shelby's Adm'r v. Cincinnati, &c., R. Co., 85 Ky., 224.

But the case here, according to the appellant's facts, is, that of the appellee having turned its rear cars loose, unlighted in front, and, therefore, not under control, so far, at least, as to render any assistance, the night being dark, in case of a collision with any person that might be on the track. The cars being separated from the engine, their approach would be, at least as compared with the ordinary movement of trains, almost noiseless, and not likely to be heard or noticed; also, on a dark night, and, in the absence of a light to arrest the attention, their approach would not, ordinarily, be observed until too late to get out of the way. It is a

well-known fact that a person, standing in a straight
line with a train that is approaching or receding, is
often unable to discern that it is moving ; this is so,
even in the daytime ; on a dark night, it may be re-
garded as a fixed fact, that a person, being on the
track of a road-bed, would be unable to discern cars,
unlighted, approaching him by their own momentum,
until they had gotten immediately up to him.

So the question is, is the turning these cars loose,
under the circumstances, such a departure from a
manifest duty toward the local public as to entitle
the appellant to recover for the injury inflicted on his
intestate by reason of such departure, although the
intestate was, at the time, a technical trespasser upon
the track ?

The rule applicable to actions for the negligence of the
defendant is, that if the negligence of the plaintiff so
far contributed to the injury as that the injury would
not have occurred but for such contributory negligence,
he can not recover, is as well settled as any principle of
law.   But is it applicable to a case where the negli-
gence on the one side consists of a technical trespass,
as the one in this case, and a failure to perform a mani-
fest duty, as in this case ?   The omission to do, or the
doing, any thing that is the manifest duty of a person
to do, or not to do, does not entitle such person to im-
munity from liability in damages to the person injured
thereby, simply because such person was a mere tres-
passer, and but for which the injury would not have
occurred.   Where the injury is the result of the non-
performance or a violation, however innocent of inten-
tion, of a plain and manifest duty for the protection of

human life or safety, the party thus acting will not be heard to say, in justification, that the person thus injured was merely a trespasser. This is true, even though the party injuring was dealing with his own property, and the party injured was a technical trespasser thereon. Of course, the foregoing rule does not apply, if the injured party, knowing the existence of the danger, purposely or negligently puts himself in its way; he thus puts himself in its way at his peril, and should be considered as having purposely brought the injury on himself, and should be left to bear it. A train of running cars—these were running, according to the appellant's proof, at the rate of about fifteen miles per hour—is more dangerous to the life of persons with whom it comes in contact than that of the most ferocious and powerful wild animal. And, certainly, it can not be lawfully turned loose to run by itself, and expose persons that may be on the track, either by accident, mistake or design, to its destructiveness.

Humanity positively forbids the owner of property that is dangerous to human life and safety to knowingly turning such property loose, even upon his own ground, where it will do mischief, even to a technical trespasser. Such conduct is regarded as utterly at war with the principles of humanity and as smacking of savagery. That the party hurt was a mere trespasser, and, otherwise than in this legal aspect, perfectly innocent and harmless, does not excuse the person that injured him by means manifestly injurious to human life and safety. By being technically a trespasser he does not forfeit all right to protection. This fact is

made manifest in various ways: for instance, although, ordinarily, the conductor, in running his train, is not bound to look out for trespassers, yet he is bound, if he discovers them in time, to use all means at his command to protect them. Why is he not ordinarily required to look out for trespassers in running his train? It is not because the trespasser has forfeited his right to protection, but it is because he has the right to presume that he will not trespass upon the track; but if he does trespass, and is seen, it is the duty of the conductor to use all the means at his command to protect him. This obligation presupposes it to be the duty of the owners of the train to have it always properly and efficiently equipped and controlled, and while it is ordinarily not their duty to look out for trespassers, yet they have no right to voluntarily deprive themselves of the means and power of protecting them if discovered in time. If the train, with steam up and under headway, should be abandoned and permitted to run by itself, no one would doubt the owner's liability for any injury done to a trespasser on the track while thus running. Why so? Because those whose duty it was to have the train in charge had abandoned it to the destruction of human life, and had deprived themselves of the power of preventing it. It has been repeatedly held—indeed we do not recall a single exception to the rule—that if a person knowingly turns a ferocious animal loose, even in his own inclosure, which is likely to be visited by mere trespassers, and any trespasser, ignorant of the presence of the animal, is injured by such animal while trespassing in the inclosure, the owner is liable in damages for the injury.

The owner has the right to the exclusive use of the animal and inclosure, but he has no right to do that which is a manifest injury to others, even though such others be trespassers; for there is no proportion between the technical trespass in merely walking through another's inclosure and the manifest wrong done to the life and safety of all persons, whether trespassers or not, that may come in contact with it. It is the duty of the citizen not to knowingly do an act that will hazard human life and safety, unless it is done to prevent crime. If the appellee had turned loose on the track a ferocious bull to run down it, and, in running down it, it had killed the appellant's intestate, would it be doubted that the appellee would be liable in damages for the injury, although the intestate was a trespasser? Both the bull and the track belonged to the appellee, and the deceased was technically a trespasser on it, else he would not have gotten killed, yet the appellee is made responsible for the killing, because he does that which is manifestly dangerous to the lives of all persons that may rightfully or wrongfully be on the track. It may be said that the parallel between the cases just put and the running of the train is wanting in the fact that the running of the train is a business operation, and is governed as to matters of damages for a violation of prudential business rules and obligations, and in the cases put the parties are held responsible for violating police duties and obligations. As a general proposition, this distinction is correct. But here the train, possessing most destructive power, contrary to a manifest duty, is turned loose to run, unlighted and uncontrolled, and kill all persons, whether

trespassers or not, that may be overtaken by it. Such conduct is a violation of a manifest duty to the public —trespassers and all—not to turn such a power loose. An instruction ought to have been given in accordance with the foregoing views.

The judgment is reversed, with directions to grant a new trial, and for further proceedings consistent with this opinion.