## TEAKLE v. SAN PEDRO, L. A. & S. L. R. CO.

No. 1827. Decided May 9, 1907 (90 Pac. 402).

1. **Appeal—Prejudice—Exclusion of Evidence.** Plaintiff was not prejudiced by the exclusion of evidence to prove a fact already shown by other witnesses.

2. **Same—Assignment of Error—Necessity.** The direction of a verdict for defendant cannot be reviewed on appeal where the ruling is not assigned as error.

3. **Railroads — Persons on Track — Licensees — Care Required.** Where, for a considerable period of time, numerous persons had been accustomed to walk along or across a railroad track in a populous city, such persons were licensees, whose presence the railroad's train operatives were bound to anticipate and observe a reasonable lookout in order to prevent injury to them, when their attention was not directed to the performance of other duties.[1]

4. **Same—Care of Pedestrian.** Where a licensee was killed while walking along a railroad track, he was himself bound to observe a reasonable lookout for his own safety and exercise reasonable care, notwithstanding the duty imposed on the train operatives to observe a reasonable lookout to prevent injury to him.

5. **Same—Contributory Negligence.** Where intestate stepped on a switch track in front of a moving train, when but to look or

---

[1] Young v. Clark, 16 Utah 42, 50 Pac. 832; Corbett v. Oregon Short Line R. Co., 25 Utah 449, 71 Pac. 1065.

otherwise to use ordinary care would have disclosed to him the train's approach, his negligence was a contributing cause of the accident, and barred a recovery unless intestate's death would not have resulted but for defendant's negligence occurring after intestate's negligence had spent its force.

6. NEGLIGENCE—DISCOVERY OF PERIL. Before a person inflicting an injury can be charged with an omission of duty in failing to discover a perilous situation of another, there must be a duty owing from him to the person in peril which had it been performed with reasonable care would have disclosed the perilous position of the person injured.

7. RAILROADS—DEATH OF LICENSEE—LAST CLEAR CHANCE. Intestate, a licensee on defendant's railroad track, stepped in front of a backing train, consisting of an engine, tender, mail car, and baggage car. He was struck by the baggage car and thrown between the rails. No part of the train touched him except that a brake rod merely touched his clothing, until he was struck by the firebox of the engine, which rolled and dragged him, and when the cowcatcher passed over him he was crushed and dead. The brakeman on the end of the baggage car gave signals to the engineer to stop as soon as intestate was struck, but was unable to attract the engineer's attention, and another witness ran along the track on the fireman's side of the train, which was 184 feet long, and attempted to attract his attention, but was unable to do so. *Held*, that defendant, being bound to observe a lookout for licensees on the track, was also bound to provide for the exchange of signals, and that the doctrine of last clear chance was applicable, though the engineer had no actual knowledge of intestate's peril.

8. SAME—EVIDENCE. Evidence as to the distance within which the train might have been stopped after intestate was struck was admissible, not only with respect to the duties owing from the engineer after he had knowledge of intestate's peril, but also with respect to the duties owing from the train operatives continuing or intervening after the commission of intestate's negligence, which, had they been performed with reasonable care, would have disclosed to the engineer the perilous situation in time to have avoided the fatality.

APPEAL from District Court, Third District; before Justice T. D. Lewis.

Action by Nellie Teakle, as administratrix of the estate of Thomas W. Teakle, deceased, against the San Pedro, Los Angeles & Salt Lake Railroad Company. From a judgment for defendant, plaintiff appeals.

REVERSED, AND NEW TRIAL GRANTED.

*Richards, Richards & Ferry* for appellant.

*Whittemore & Cherrington* for respondent.

### APPELLANT'S POINTS.

The evidence sought to be introduced by these questions and offer was clearly competent to show that the defendant had a last chance of avoiding the accident regardless of any negligence that may be imputed to the deceased. Since the time of *Davies v. Mann* the courts unanimously have upheld this principle and this court has concurred in it—that one who last has a clear opportunity of avoiding an accident, notwithstanding the previous negligence of his opponent, is considered solely responsible for the injury. (*Thompson v. Rapid Transit Rd. Co.,* 16 Utah 281; Shearman and Redfield on Negligence [5 Ed.], sec. 99; *Burgess v. Railroad* 17 Utah 406.)

### RESPONDENT'S POINTS.

"If taking these precautions he would have seen or heard the approaching train the very fact of injury will raise a presumtion that he did not take the required precaution." (*Herbert v. Southern Pacific Co.,* 53 Pac. 651; *Green v. Railroad,* 76 Pac. 719.)

Excepting in Pennsylvania and Ohio we believe the decisions as to "look and listen" are unanimous and to the effect that a recovery cannot be had for injuries sustained by one who himself voluntarily, deliberately and negligently contributed to such injuries, and that the negligence of the defendant, whether proven or admitted, becomes in such cases immaterial unless so gross as to amount to wantonness or malice. (*Olsen v. Railroad,* 9 Utah 129; *Peck v. Railroad,* 25 Utah 21; *State v. Railroad,* 49 Am. 622; *Buelow v. Railroad, supra; Railroad v. Houston, supra; Railroad v. Mosely, supra; Green v. Railroad, supra; Schmidt v. Railroad,* 3 L. R. A. [N. S.] 196; *Baker v. Railroad,* 87 Pac. 826.)

STRAUP, J.

Plaintiff brought this action to recover damages for the death of her intestate, alleged to have been caused through the negligence of the defendant. The accident occurred at Salt Lake City, between First North and North Temple streets, in the railroad yard of the Oregon Short Line Railroad Company, along and over the tracks of which the defendant operated its cars. The yard and tracks were not inclosed, and extended in a southeasterly and northwesterly direction for several blocks, and had been traveled by numerous persons in going to and from their work, and had been generally used and traveled by men, women, and children as a thoroughfare, for eight years or more without objection. While they were so being used, the employees of the defendant were there and knew of such use without making any objection thereto. At the corner of First North and Fourth West streets there · was a sign which read that the tracks were railroad property, and trespassers were warned to keep off, but, notwithstanding the sign, the tracks and yard were continued to be used by the public generally as a thoroughfare without hindrance or objection. The tracks and yard were along thickly settled portions of the city. At about 7:40 a. m. of the 10th day of October, 1905, the deceased, who lived on First North street and west of the yard, in going toward his place of work, at a store in the business portion of the city, was walking in the yard with a companion in a southerly direction between two parallel tracks, about thirteen feet apart. While the deceased was so walking along in the yard between First North and North Temple streets, the defendant, engaged in switching cars in the yard, operated a train of cars, consisting of an engine, tender, mail car, and baggage car, in a northerly direction, and on what is called the "main" track, which lay to the west of where the deceased was walking. The train was operated past him and beyond a switch, some little dis· tance to the north of the deceased. It was then backed and moved in a southerly direction at a speed of from three to five miles an hour, and was switched from the main track to a track immediately to the east of it. ' The evidence is not

very clear whether the deceased was walking between the
main track and the track immediately east of it, or between
two tracks east of the main track. However, as the train
was being switched from the one track to the other, and as
the baggage car, which was the first car approaching him,
reached the junction of the track east of the main track and
the cross switch track, the deceased, who was on the track at
that place, was struck by the baggage car, and was thrown be-
tween the rails of the track and was killed. There were
about six other persons walking along the tracks in the yard
and in a southerly direction at the same time that the de-
ceased and his companion were so doing. Some of them
passed the deceased on the way. One of them testified that
he saw the train go to the north; that he expected it to come
back; that he turned around and looked for it; that, when
he was on the south side of North Temple street (a short dis-
tance south of the place of the accident), he saw the deceased
"on the track at the frog where a switch track crosses from
the track to the west into the track on the east. When the de-
ceased was struck, the south end of the car was still on the
switch track, and had not turned to the easterly track. The
engine was pointing toward the north." Another witness
testified: "When I got to North Temple street I heard a
yell and turned around. I saw Teakle [the deceased] im-
mediately in front of the car at a point where the switch track
comes from the track to the west of where he was walking
into the track to the east of where he was walking. He had
not changed his course when the car struck him." From this
testimony it may be inferred that the deceased was walking
between the main track and the track immediately east of
it, and was crossing or walking on the switch track connect-
ing these two tracks when he was struck. The brakeman, who
was on the front or south end of the baggage car testified:
"When I first saw these men [the deceased and his compan-
ion], they were in the open space between the cinder pit and
the track [which was between the two tracks east of the main
track], walking south, clear of the train on the track that we
were on. They stepped over on our track about twenty feet

in front of us." Either view of the evidence, however, shows that the deceased stepped on the track in front of the moving train. The morning was bright and clear, and the deceased's view of the train was wholly unobstructed. The ground was practically level, sloping slightly to the south. The train could easily have been seen by him, and he could easily have been seen by the train crew. Four witnesses, persons who were walking along the yard at the time in question, testified that they heard no whistle blown nor bell rung, nor any warning given before the collision and as the train approached, and that, had such warnings been given, they would have heard them. One witness also testified that, when the deceased was struck, he was thrown between the rails with his head to the north and his arm thrown over the east rail of the switch track, and that the witness, who was but a short distance away, "immediately ran back to where he was, and when I reached there he was still lying in the same position as he had fallen. Hadn't been moved, and his clothing was not disarranged. The set of trucks on the north of the car had not reached him. I saw this end of the car pass over him, also the car following, and the tender of the engine, during all of which time he remained in the same position and with his clothing in the same condition. I know that he was alive when I first reached him, because I saw him lower his head. In passing over him no part of the train touched him, except one brake rod, which merely touched his clothing, until he was struck by the fire box of the engine," which rolled and dragged him, and when he came out from under the cowcatcher he was crushed and doubled up, and was then dead. Several other witnesses testified to the same facts. Another witness testified that, when he reached the place where the deceased was lying, the north end of the truck of the car which struck him had not yet passed over the deceased, and that the witness then ran along the track to the north a distance of three or four yards on the fireman's side of the train, hallooing that there was a man under the train and to stop; that he did not see the fireman in the cab, and could not attract his attention; and that he then returned to the place where the

deceased lay. The train was about 184 feet in length. The brakeman testified that he was on the southeast corner of the baggage car, and, when the deceased stepped on the track, he hallooed and tried to attract his attention; that he (the brakeman) gave signals to the engineer to stop as soon as the deceased was struck; that the baggage car was on a reverse curve, which would constitute some obstruction to the engineer's view; that he gave no other signal on the car because he knew that the engineer could not see any further signals given on the car, because of the curve, and that he then jumped off the east end of the car, and ran around in front of the moving train to the west side and gave a signal on the fireman's side. He further testified: "I could not get off of the car on the east to any advantage, simply because there was a cinder pit in front of me and a trestle, which were so close to the track we were on as to still have the engineer's view of me obstructed by the curve. There was no way I could have stopped the car myself. . . . I did not run north along the side of the train on the engineer's side on account of the cinder pit, which was nine or ten feet from the east rail on which the train was moving." The foregoing is a substantial statement of the evidence as shown on the part of the plaintiff. When she rested her case, the defendant also rested. At the request of the defendant the court directed a verdict in its favor. The plaintiff appeals.

During the trial the plaintiff called a witness, a Mr. Reid, who, after he had testified that he was walking in the yard about fifty feet from the accident and had seen the train approaching before it struck the deceased, was asked: "Well, now then, at any time within a minute or two before you saw this train approaching North Temple street [which was about fifty feet from the place of the accident] did you hear any whistle sounded?" This was objected to as being irrelevant, immaterial, nd incompetent, and particularly for the reason that whistles and signals are intended for the use and benefit of people making a legitimate use of the highway, and not for people who are off the highway and on property

belonging to the railroad company. The objection was sustained. The plaintiff also called a Mr. Ganzer, who, after testifying that he was a locomotive engineer and was familiar with the large passenger engines of the defendant, was asked if he could state within what distance a passenger engine pushing or backing a mail car and a baggage car could be stopped on a slight incline or level track; the train moving at from three to five miles an hour. This question was objected to as irrelevant, immaterial, and incompetent, and particularly for the reason that in view of the proof, it was immaterial in what distance the train could be stopped. Plaintiff's counsel stated that the purpose was to show that after the deceased was knocked down the car could have been stopped within a distance of fifteen or twenty feet. "The Court: Until it is apparent that the engineer saw him or knew that he was on the track there, I do not see how it is material. The objection will be sustained." Several other questions of like kind were asked the witness, and offers of proof were made that the train in question could have been stopped after the deceased was struck within fifteen or twenty feet, but to each of them the court sustained objections for the same reasons heretofore stated.

The ruling of the court directing a verdict in favor of the defendant is not assigned as error. The errors assigned relate to the rulings excluding the testimony of witnesses Reid and Ganzer. The fact sought to be shown by the witness Reid had already been shown by four or five witnesses. Assuming that it was competent and material to show the failure to give such warnings, proof of such fact was sufficiently made, without the testimony of Reid, to entitle the plaintiff to go to the jury on such question. It is not made to appear that the plaintiff was prejudiced because she was not permitted to show the failure to give the warnings by this particular witness. If the ruling of the court directing a verdict was right notwithtsanding four or five witnesses testified that no bell was rung or whistle blown, it still would have been right had the witness Reid been permitted to testify to the same fact. It is manifest that it was not the ruling upon

this question which resulted in the direction of the verdict. If the court erred in directing a verdict, such ruling ought to have been assigned, in order to authorize us to review it. The assignment of error is the foundation upon which rests the right of the appellate court to review the errors imputed to the trial court, and this court has repeatedly held that only such errors as are assigned will be reviewed, unless it is something which goes to the jurisdiction of the court.

The next ruling complained of is that the plaintiff was not permitted to show that the train could have been stopped within fifteen or twenty feet after the deceased was discovered on the track by the brakeman, and after he was struck by the moving train. This evidence was offered, as stated by plaintiff's counsel, in support of the theory, based on the last clear chance doctrine. This assignment rests upon a foundation different from the other. The showing of this fact was essential in support of the theory. Without it, the evidence would be insufficient to support it. Its absence necessarily leads to a direction of a verdict for the defendant, if plaintiff's case depended upon the doctrine for a cause of action. If erroneous, the ruling was therefore prejudicial. This is not so because the proffered testimony was within itself sufficient to entitle the plaintiff to go to the jury, but because it was a material and essential element required to be shown in proving that the defendant had the last clear chance to avoid the consequences of the deceased's negligence. We therefore pass to a consideration of the ruling excluding this evidence.

The ruling seems to have been made on the theory that the deceased was a trespasser, and that the train operatives owed him no duty until he was discovered in a position of peril, and then only owed him the duty not to inflict a willful or wanton injury upon him; and therefore the engineer owed no duty of lookout, nor to stop the train, until he had knowledge of the peril. It undoubtedly is the general rule that train operatives owe no duty of lookout to discover a trespasser upon the track, and to such a one owe no duty until he is discovered in a position of danger. But the authorities

seemingly divide on the point as to whether a person, walking along the track, as did the deceased, under the circumstances disclosed by the evidence, is a trespasser or stands in a relation any better than that of a trespasser; that is, whether one who walks along or crosses a railroad track at a place where for many years the general public have been accustomed to make the track a thoroughfare without objection, or by the acquiescence of the railroad company, stands in the relation of a trespasser in the sense that the train operatives owe no duty of lookout or of giving warnings when operating trains along such place. It has been held that such a person is a trespasser, and that the train operatives owe him no duty of lookout or of giving warnings, and that the only duty owing by them to him is not to wantonly or willfully injure him after he is discovered in a perilous situation. (*Egan v. Montana Cent. Ry. Co.*, 24 Mont. 569, 63 Pac. 831; *Glass v. Memphis & Charleston R. R. Co.*, 94 Ala. 581, 10 South. 215.) Mr. Elliott, in his work on Railroads (volume 3, section 1250), with considerable force urges that, whether such a person be regarded a trespasser or a bare licensee, the duty which the train operatives owe him is the same—not to willfully or wantonly injure him, but to use reasonable care to avoid injury after his danger is discovered, that, if a person be there as a bare licensee, his license is subject to the "concomitant perils," and that he will look out for his own safety without special warnings or change by the company in the manner of using its railroad, and that the train operatives may act on this assumption until they discover the danger.

The foregoing, of course, are not all the cases or authorities holding such doctrine, but they well illustrate the views taken by some able courts. But this court is committed to a contrary doctrine. In the case of *Young v. Clark*, 16 Utah 42, 50 Pac. 832, it was said:

"Where the public in considerable numbers have been accustomed for a great length of time to use a bridge or railroad track as a footpath in populous cities or thickly settled communities, without molestation or objection from the company, and by reason of such general custom the presence of people upon such track or bridge is probable, or

might reasonably be anticipated, those in control of passing trains are bound to use reasonable diligence and precaution to prevent injury to those who might be thereon, even though they were trespassers. . . . We are of the opinion that when the community, situated as this was with reference to the bridge, have for seventeen years been accustomed to use the bridge as a footpath, without objection, the company is chargeable with notice of such usage and owes a duty to use reasonable care to prevent injury to persons that are liable to be crossing the same, even though they do so without authority."

In the case of *Corbett v. Oregon Short Line R. Co.*, 25 Utah 449, 71 Pac. 1065, the trial court refused to charge, though the defendant was negligent in the operation of the engine which caused the injury, yet, if the jury found that the parents of the deceased child were guilty of negligence in permitting it to go unattended upon the railroad track, and that such negligence contributed to the injury complained of, it barred recovery, "unless you further find from the evidence that notwithstanding such negligence of the parents or either of them the defendant's servants, by the exercise of ordinary care, might have avoided the accident after in fact discovering the child's peril." This court held that it was not error to refuse the request, for this, among other, reasons:

"That it does not correctly state the law as applied to the evidence of this case, in that it assumes that the defendant was under no obligation to anticipate persons being upon the track at this point. With an unfenced track bordered by habitations on each side, and used quite generally as a highway for both grown people and children, surely some diligence was required by defendant other than 'after in fact discovering the child's peril.' . . . The instruction asked by the defendant ignored entirely the fact whether the use of the track for foot passengers was not such as to render it probable, or reasonably to be expected, that people would be upon the track at this point."

The rule is well stated by the court in the case of *Garner v. Trumbull*, 94 Fed. 321, 36 C. C. A. 361, where it is said:

"At the conclusion of plaintiff's evidence, and without the production of any evidence on the part of the defendant, the court directed a verdict in favor of the defendant, which is the error complained of. This instruction was doubtless given on the theory that the child was a trespasser on the track of the railway company; that the engineer of the train, and other train operatives, on that account, owed the child no duty until they saw it; and that they were under no obligation to

anticipate its presence on the track, or to be on the lookout either for it or other persons at the place where it was run over and killed. There are some adjudged cases which doubtless support such a view, but we are persuaded that it is not a correct rule, as applied to those portions of a railroad track which many people have been in the habit of using as a footpath for a considerable period, without objection on the part of the railway company, although without any express license to do so. Train operatives ought to be required to take notice of such usages and of conditions which actually exist, and to regulate their actions accordingly. A proper regard for the safety of persons and properly intrusted to their charge, and in human life in general, should impel them to do so. When, therefore, for a considerable period numerous persons have been accustomed to walk across a railroad track or along a railroad track between given points, either for business or pleasure, railroad engineers should take notice of such practice, and, when approaching such places, should be required to exercise reasonable precaution to prevent injury to them. Knowing the usage which prevails, they may reasonably be required to anticipate the probable presence of persons on or near the track at such places, and to be on the lookout when their attention is not directed to the performance of their other duties."

It was there held that, under the circumstances of the case, it was necessary for the jury to determine whether the engineer and fireman did in fact exercise ordinary care to discover the child. In the case of *Crawford v. Southern Pacific Ry. Co.,* 106 Ga. 870, 33 S. E. 826, it was observed:

"Admitting, for the sake of the argument that the general rule is that a railroad company owes no duty to a trespasser who is upon or dangerously near its track in front of a moving train, until its servants have discovered its presence there, and therefore, so far as his safety is concerned, is not obliged to maintain a lookout in the direction in which the train is moving, we do not think that this could properly be held to be a uniform, fixed, and invariable rule, applicable alike to all cases and under all circumstances. Conduct which might, under one set of circumstances, show that all ordinary and reasonable care and diligence had been observed, might, under a different set of circumstances, be insufficient to show an observance of such care and diligence. We think that such a rule could mean no more than this: Taking the locality where the train is running and all the surrounding circumstances, if those in control of the movement of the train have no reason to apprehend that there may likely be a human being on the track in front of the engine, they are under no duty to one who in fact may be there, until they have actually discovered that he is there. But if, from the locality or surrounding circumstances, there is reason to apprehend that the track in front of the locomotive may not be clear

of human beings, then, it seems to us, it is the duty of the employees of the company to keep a lookout ahead of the train, most assuredly so unless they are performing some duty which prevents their looking out upon the track in the direction in which the train is moving."

In Shearman & Redfield on Negligence (5th Ed.), section 484, the rule is stated as follows:

"The defendant is responsible, not only for what he actually knows, but for that which he is bound to know. It is clear that the frequent statements that contributory negligence is an absolute bar to recovery, except where the defendant's conduct has been 'reckless,' 'willful,' or 'wanton,' or even grossly negligent, are not sound. No courts have in actual practice adhered to this imaginary rule. It has been explicitly overruled, and, indeed, it has been explained away or disavowed by courts which had previously stated it. Nothing more is really meant by the courts using these phrases than a want of ordinary care, after becoming actually aware of the plaintiff's peril. But it is much better to say so. The more frequent declaration that the defendant is not liable, unless he actually sees or knows the plaintiff's peril, are, however, equally erroneous, as too broad statements of abstract law, however proper they may have been with reference to the particular case under consideration. The rule that a plaintiff is as matter of law negligent if he fails to see what he was bound to look for and ought to have seen is rigidly enforced; and the same rule must, in common justice, be applied to the defendant. And, in fact it actually is in almost every court where the question is squarely presented. Trainmen may justly assume that travelers will comply with the law in accordance with the general rule upon that point; but if observation has convinced them that, at certain times and places, this assumption is not borne out by the facts, they are not justified in acting upon it. Therefore, while trainmen are not usually bound to foresee or watch for the wrongful presence of any person upon the track, even where it is open to an adjoining highway, nor to foresee the wrongful entry of persons upon the cars, yet, if experience has shown that at certain points persons are constantly thus entering upon the track or the cars such persons, if injured as the proximate result of the trainmen's failure to use ordinary care to keep watch for them, may recover damages if the trainmen could have seen them without difficulty, had they kept a reasonble watch, even though, in fact, they did not see them. Especially should this rule be applied where the railroad company has acquiesced in the use thus made of its property." To the same effect are the following: *Bullard v. So. Ry.*, 116 Ga. 644, 43 S. E. 39; *Chamberlain v. Mo. Pac. Ry. Co.*, 133 Mo. 587, 33 S. W. 437, 34 S. W. 842; *Morgan v. Wabash R. Co.*, 159 Mo. 262, 60 S. W. 195; *Va. Mid. R. R. Co. v. White*, 84 Va. 498, 5 S. E. 573, 10 Am. St. Rep. 874; *Harriman v. Railway Co.*, 45 Ohio St. 11, 12 N. E. 451, 4 Am. St. Rep. 507; *Cassida*

v. Or. R. & N. Co., 14 Or. 551, 13 Pac. 438; Whalen v. C. & N. R. Co:, 75 Wis. 654, 44 N. W. 849; Chicago, B. & Q. R. Co.. v. Wymore, 40 Neb. 645, 58 N. W. 1120; H. & T. C. Ry. Co. v. Sympkins, 54 Tex. 615, 38 Am. Rep. 632; Gunn v. Ohio River R. Co., 42 W. Va. 676, 26 S. E. 546, 36 L. R. A. 575; Mason v. Southern Ry., 58 S. C. 70, 36 S. E. 440, 53 L. R. A. 913, 79 Am. St. Rep. 826; McCall v. Railroad, 129 N. C. 298, 40 S. E. 67; Pickett v. Railroad, 117 N. C. 616, 23 S. E. 264, 30 L. R. A. 257, 53 Am. St. Rep. 611; Wooster v. C., M. & St. P. R. R. Co., 74 Iowa, 593, 38 N. W. 425; Conley's Adm'r v. C., N. O. & T. P. Ry. Co., 89 Ky. 402, 12 S. W. 764; Hopk. Pers. Inj. section 87; 2 Thomp. Com. Law of Neg. section 1726.

From the authorities we are inclined to adhere to the rule already announced by this court that when for a considerable period numerous persons have been accustomed to walk across or along a railroad track in a thickly settled community or populous city, as shown by the evidence in this case, train operatives ought to be required to take notice of such usage, and to anticipate the probable presence of persons on or near the track, and to observe a reasonable lookout when their attention is not directed to the performance of other duties. On the morning in question some six or seven persons, including the deceased and his companion, were walking in the yard along the tracks in a southerly direction. They were making such use of the track as many others had made of it for a period of eight years. To require the train operatives to take notice of such usage and to regulate their actions accordingly is not unreasonable. Some duty, therefore, was imposed upon the train operatives with respect to observing a reasonable lookout in the direction of the moving train, the extent of which is not for us to say, but is to be determined by the triers of fact under all the circumstances of the case.

Notwithstanding such duties imposed on the train operatives, the deceased was himself in duty bound to observe a reasonable lookout for his own safety, and to exercise all reasonable care commensurate with the attending dangers to avoid coming in contact with cars and trains being moved and operated in the yard. He was at a place where cars might momentarily be expected. He had an unobstructed view of

32 Utah—19

the premises, and there was nothing to divert his attention or to prevent him from seeing or hearing the approach of the cars. His act of walking or stepping on the track in front of the moving train without observation, as shown by the evidence, rendered him guilty of negligence as matter of law. We think this is true whether he was walking between the two tracks east of the main track, or between the main track and the track immediately east of it. In either event, the evidence shows that he stepped upon the switch track in front of the moving train, when but to look, or otherwise to use ordinary care on his part, would have disclosed to him the approach of the train. (*Mo. Pac. Ry. Co. v. Moseley,* 57 Fed. 921, 6 C. C. A. 641; *Railroad Co. v. Houston,* 95 U. S. 697, 24 L. Ed. 542; *Buelow v. C., St. P. & K. C. Ry.,* 92 Iowa 240, 60 N. W. 617; *Balto. & O. R. R. Co. v. Schroeder,* 69 Md. 551, 16 Atl. 212.) Such negligence on the part of the deceased was a concurring and contributing cause of the collision, and barred all right of recovery for whatever injury resulted therefrom, upon the principle of law that when the negligence of two persons is contemporaneous, and the fault of each operates directly to cause the injury, neither can recover from the other except for a willful or wanton infliction of the injury. If, therefore, the deceased's death was caused by the train's striking him, his contributory negligence barred recovery, for there is nothing to show that the train's striking the deceased was done willfully or wantonly. The plaintiff, however, both by her pleadings and by her evidence, sought to recover on the theory that the death of the deceased was not caused by his being struck by the train, but by the fire box of the engine, which could have been prevented by the train operatives had reasonable care been observed on their part after the commission of the deceased's negligent acts and after he was struck by the train. In order to render the defendant liable, it was therefore essential to show, as was attempted by the plaintiff, that its servants in charge of the train were guilty of a breach of duty continuing or intervening thereafter which was the proximate cause of the death. There are some authorities which hold

that such breach of duty, under the doctrine of last clear chance, can only arise after the consequences of the contributory or antecedent negligence have been discovered. Hence it is urged that the engineer could not have been in fault in his failure to stop the train until he had knowledge that the deceased had been struck and was under the train. But, on an examination of the authorities so holding, it will be observed that most of such rulings were made with respect to actual trespassers or to a wanton or willful infliction of an injury, and, as is said by Shearman and Redfield, at section 484,

"We think that the courts which still adhere to the doctrine which confines liability to cases of actual knowledge of peril only apply it to trespassers and not to mere instances of negligence on the part of the plaintiff not trespassing."

In 55 L. R. A. 418 may be found an extensive discussion of the doctrine of "last clear chance," and where many cases from nearly all the states are collected and reviewed. They are summarized by the compiler on page 465 as follows:

"The foregoing review of the authorities, while disclosing much difference of opinion with reference to the ultimate question as to the defendant's liability to one guilty of negligence, under a given set of facts and circumstances, seems nevertheless, when proper distinctions are observed, to show a decided tendency on the part of the courts to apply the doctrine of 'last clear chance' to any omission of duty on the part of defendant, whether before or after discovering the peril in which the plaintiff or deceased had placed himself, or his property, by his antecedent negligence, if that breach of duty intervened or continued after the negligence of the other party had ceased."

This court, in harmony with the great weight of authority, seems to be committed to the rule (when the injured or deceased person was not a trespasser) that the defendant's act of negligence will be regarded as the sole proximate cause of the injury, not only when relating to a breach of duty occurring after the consequences of contributory negligence have been discovered, but also when, in the exercise of ordinary care, such consequences could have been discovered, if a breach of duty intervened or continued after the commission of the contributory negligence. While the breach of duty must be subsequent to the commission of the contributory

negligence, yet such breach of duty may be before, as well as after, the discovery of the peril. This principle of law has often been illustrated by cases where the owner of stock was guilty of negligence in permitting it to stray upon the railroad track, and where the liability of the company was made to depend, not only upon the question of whether the train operatives could have avoided the injury after the animal was discovered on or near the track, but also whether, in the exercise of ordinary care, the train operatives could or ought to have discovered it in time to have avoided the injury. So also in cases where one was guilty of negligence in the first instance in going upon the track and by reason of being caught in a frog, or was otherwise rendered unable to escape, and where the railroad company was held liable, not only for an omission of duty on the part of the train operatives after discovering the peril, but also for an omission of duty in not discovering it. In such cases the contributory negligence is deemed the remote, and the defendant's negligence the proximate, cause of the injury. Such is the principle of law which seems to have been anounced by this court in the case of *Hall v. Railway Co.*, 13 Utah 243, 44 Pac. 1046, 57 Am. St. Rep. 726, and in the case of *Shaw v. City R. R. Co.*, 21 *Utah* 77, 59 Pac. 552, and is the principle of law stated in the instruction which this court approved, and which was involved in the question decided by the court, in the case of *Thompson v. Salt Lake Rapid Transit Co.*, 16 Utah 281, 52 Pac. 92, 40 L. R. A. 172, 67 Am. St. Rep. 621, and is well illustrated in *Inland & Seaboard Coasting Co. v. Tolson*, 139 U. S. 557, 11 Sup. Ct. 653, 35 L. Ed. 270, and in *Grand Trunk Ry. Co. v. Ives*, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485.

There is much reason for the distinction that the railroad company should not be held liable in case of an actual or conscious trespasser until his position of danger is discovered, and should be held liable in case of one not a trespasser expoed to peril through negligence, not only after the conseqquences of such negligence have been discovered, but which ordinarily could have been discovered, if there was a breach

of duty continuing or intervening after the commission of the contributory negligence. In the one instance the train operatives were not called upon to expect or anticipate the trespass or the presence of persons, and hence owed no duty of lookout or of giving warnings. In such case no duty was imposed on them until the trespasser was discovered in a position of peril. In such case the liability of the company must solely depend upon a breach of duty subsequent to the discovery. If, on the other hand, through a long usage or custom the public has made a thoroughfare of the track in a populous city or thickly settled community though not with any express authority but under circumstances of an implied license, the train operatives are required to reasonably expect and anticipate the probable presence of persons on or near the track at such place, and there is consequently imposed on the train operatives a duty toward such persons of a reasonable lookout. When, therefore, it is said that the railway company is liable in such case for an omission of duty on the part of the train operatives, not only after the consequences of the injured or deceased's negligence have been discovered, but also for such an omission of duty, as had it been reasonably performed, such consequences could ordinarily have been discovered, it necessarily implies the existence of a duty owing by the train operatives toward the injured or deceased person before as well as after the commission of the contributory negligence. In other words, before a person inflicting an injury can be charged with an omission of duty in failing to discover a perilous situation of another, there must be a duty owing from him to the injured or deceased person, which, had it been performed with reasonable care, would have disclosed to him the exposed situation of the person receiving the injury. "If this test," says Mr. Thompson in his Commentaries on the Law of Negligence (volume 1, section 232), "is kept steadily in view, it will lead us out of many difficulties and prevent much confusion." The duty which the train operatives owed the deceased of observing a reasonable lookout existed before he was struck by the train as well as thereafter. The proffered evi-

dence should therefore be considered, not only with respect to duties owing from the engineer after he had knowledge of the deceased's exposed peril, but also with respect to duties owing from the train operatives continuing or intervening after the commission of the deceased's negligence, which, had they been performed with reasonable care on their part, would have disclosed to the engineer the peril of the situation in time sufficient to have avoided the fatality. The purpose of the position of the brakeman on the front of the baggage car, among others, was evidently to better observe a lookout and to apprise the operatives on the engine of any impending danger. The duty of the former was not only to observe such reasonable lookout, but to use all reasonable care and efforts to make known to the latter any situation of danger discovered by him. There likewise was a corresponding duty imposed on the operatives of the engine to maintain a reasonable lookout for the signals of the brakeman. Not to do so rendered the position of the brakeman as a watchman to a large extent useless. Whether an observance of these duties would result in averting the fatality would naturally depend in part upon the time the operatives of the train had in which to stop it, and, conversely, the time required for or distance in which the train could have been stopped, directly bear upon the question of the performance or nonperformance of those duties. The question as to the sufficiency of the evidence to show a breach of duty or negligence on the part of the brakeman, or the operatives on the engine, is not now before us. When the deceased was struck by the train and rendered helpless, the effect of his antecedent or contributory negligence was spent. Plaintiff then had the right to show if she could, a breach of duty on the part of the train operatives intervening or continuing thereafter which was the proximate cause of the death. The door should not have been closed barring her from introducing any competent and material evidence in support of it. The fact offered to be proved was not only material, but was an essential, in establishing the ultimate fact that the train operatives, in the exercise of ordinary care, could have avoid-

ed the consequences of the deceased's negligence. For, whatever omission of other duties might have been shown, if the train, in the exercise of ordinary care, could not have been stopped within such a distance as would have avoided the fatality, no liability would have been shown on the part of the defendant under the doctrine of last clear chance. Whether the plaintiff would have been entitled to go to the jury if the fact had been proven is likewise not before us. The questions presented to us for decision, and which we are called upon to decide are: Was the evidence competent and material? And was it erroneously excluded to plaintiff's prejudice? From the foregoing it is manifest that both questions must be answered in the affirmative.

The judgment of the court below is therefore reversed, and a new trial granted, with costs to the appellant.

McCARTY, C. J., and FRICK, J., concur.