## KNUTSON v. OREGON SHORT LINE R. CO.

No. 4966. Decided July 31, 1931. (2 Pac. [2d] 102.)

*Geo. H. Smith, J. V. Lyle, R. B. Porter,* and *W. Hal Farr,* all of Salt Lake City, for appellant.

*Woolley & Holther* and *Jeppson & Nebeker,* all of Ogden, for respondent.

ELIAS HANSEN, J.

On August 4, 1928, Chester Knutson, a boy of the age of 12 years, was killed near Tremonton, Box Elder county, Utah, by being run over by a train consisting of a steam engine, a baggage car, and a passenger coach. At the time

of the accident, the train was being operated by the defendant company. Fred W. Knutson, the father of Chester, brought this action to recover damages for the death of his son. The trial resulted in a verdict in favor of the plaintiff and against the defendant for the sum of $4,250. A judgment was duly rendered upon the verdict. The defendant appeals. It here seeks a reversal of the judgment because, as it claims, the evidence is insufficient to justify the verdict, and because the trial court misdirected the jury as to the law.

Plaintiff's action is founded upon alleged negligence, at the time and place in question, of the defendant in operating its train at an excessive rate of speed, in failing to keep a proper lookout for the deceased, and in failing to timely warn the deceased of the approach of the train which caused his death. The defendant denied negligence on its part, and alleged that the death of Chester Knutson was caused solely by his own negligence.

The evidence shows without conflict that at the time of, or immediately before, the accident the train was running at a speed of 30 or 35 miles per hour. At the request of the defendant, the trial court instructed the jury that the defendant could not be charged with negligence because of the speed at which the train was being operated at the time of the accident. Plaintiff does not assign such instruction as error, and therefore that phase of the case is not before us for review.

The evidence shows, without conflict, the following facts: At the time of the accident and for many years prior thereto the defendant operated a steam railroad through and in the vicinity of Tremonton, Box Elder county, Utah. During the summer of 1928, one passenger and one freight train were operated daily each way over defendant's railroad track. Occasionally, two freight trains a day were run each way. One of the witnesses testified that at the time in question Tremonton had a population of about 1,000. The census report of the United States for the year 1920 shows the

population of Tremonton as being 937, and for the year 1930 the population is given at 1,009. In addition to residences, Tremonton had, at the time in question, a number of business houses, a canning factory, and an elevator for the storage of grain. The defendant company maintained a depot near the business section of the city. The main street of the city runs east and west. The railroad track of the defendant crosses the main street at right angles thereto. The railroad track to the south of Tremonton is straight for a distance of about five miles. On the day of the accident there were no weeds or other fixed objects to obstruct a clear view along the railroad track from the main street of Tremonton to a point five miles to the south. Chester Knutson was killed on or near a bridge across a canal which runs under the railroad track at a point about 2,700 feet south of the main street of Tremonton. At a point about one mile south of the main street of Tremonton, a public road crosses the railroad track at right angles thereto. At a point about 750 feet north of the canal bridge, the defendant maintained a cattle guard and wing fences. Defendant's right of way from the cattle guard and wing fences northward was not fenced. The right of way to the south of the cattle guard was fenced. At the cattle guard and wing fences, and also at the public road crossing about one mile south of the main street of Tremonton, the defendant company maintained on its right of way signs on which were printed "Private Property, No Trespassing." The city limits of Tremonton extend south to within about 150 feet north of the bridge where the Knutson boy was killed, but from photographs which were offered in evidence it is made to appear that the built-up portion of the city extends only a short distance to the south of the main street. So far as appears, there were no houses closer than one-fourth mile from the place where the accident occurred. The train which killed the Knutson boy was coming from the south towards Tremonton. The accident occurred some time between four o'clock and six o'clock in the afternoon. The

exact time is not fixed with certainty by any of the witnesses.

The plaintiff introduced evidence tending to establish these facts: That on the day in question, the Knutson boy was in charge of his father's milk cows; that the cows were being herded on the right of way along the railroad track of the defendant company; that the Knutsons and three or four other people who lived in or near Tremonton had frequently herded or staked their cows on defendant's right of way both to the south and north of the canal bridge; that between ten and fifteen families who lived in the vicinity of the canal bridge and to the south thereof frequently, esspecially when the roads were muddy, used the railroad track in walking to and from Tremonton; that occasionally residents of Tremonton who owned farms to the south thereof walked along the railroad track in going to and from their farms; that at times people had ridden on horseback along the track; that daily, or almost daily during the summer season of the year 1928 and prior thereto, boys ranging in numbers from one or two, to as many as fifteen, used the canal at and near the canal bridge as a swimming place; that there were boys there most of the day; that occasionally boys stood on the railroad bridge which crossed the canal and dived into the water in the canal; that they went across and along the railroad track; that in going to and from the canal bridge the boys who resided in Tremonton usually walked along the railroad track; that when the boys were on the railroad track at the canal bridge they could be seen from the main street of Tremonton; that on numerous occasions boys were in swimming in the canal when the defendant's trains passed by; that the canal at that place had been used by boys for swimming during the past twenty-three years; that a boy about the size of, and dressed as was the Knutson boy when he was killed, and lying on the railroad bridge at the place and in the manner it was claimed the Knutson boy was lying at the time of the accident, could be seen and distinguished as a human being at

a distance of 400 yards south of the bridge. Plaintiff also offered evidence tending to show that the whistle of the engine which ran over the Knutson boy was sounded as it approached the public crossing about half a mile south of the canal bridge, but that it was not again sounded until at or near the canal bridge. Plaintiff also offered evidence that such a train as the one in question running at the speed that the train was running at the time of the accident could be stopped in a distance of between 240 and 280 feet, and that the body of the Knutson boy, after the train stopped, was about 125 feet north of the canal bridge.

So far as appears, the only person who actually saw the accident was the engineer who was operating the train. He was called as a witness by the defendant company. He thus described what occurred:

"On approaching the whistling post station Tremonton I gave one long blast of the steam whistle. * * * That is to denote there is a station. * * * the whistling post is approximately 1000 feet south of the canal. * * * After I had sounded the station whistle, I noticed an object on the track, when I approached a little closer I could make sure what it was, two dogs on the canal bridge, one was standing quartering across the bridge and the other was sitting down right besides it. When I was about three hundred feet or thereabouts from the bridge, I gave what we termed a short crossing whistle signal, that is the blasts of the whistle are just as loud, but not as long as the usual public road crossing whistle we are required to give. After I had sounded this whistle, thinking it would frighten the dogs off, as I don't like to kill or run over anything, I kept my hands still on the whistle cord, when I got within about approximately one hundred, or one hundred and fifty feet of the bridge, the dogs stepped off, one to the left, the spotted one to the left side of the track and the brown one to the right side of the track, as soon as they moved this body of this boy came in sight and I immediately put the brake valve in emergency position and shut off the throttle with my right hand and grabbed the whistle cord and gave one or two, possibly three short shrieks of the whistle, I couldn't say how many. * * * I only got a short view of the boy, he was laying that position with his head towards the south, almost in the middle of the track, and almost in the middle of the bridge. * * * In a line parallel to the railroad itself. * * * I did everything I could to stop the train. * * * Before the train had came to a stand-still, I started

to get off, I didn't even shut off the bell ringer, or shut off the automatic brake, and before it hardly came to a stand still I got off on the ground, I walked beside the baggage car door and called the baggage man to hand me the stretcher, he handed me the stretcher I walked back to the coach where Mr. Smith was on the ground and we walked back to where the remains were, I was a little ahead of Mr. Smith when we reached there the brown dog was crawling up on the remains and the spotted dog we had to beat him off with the stretcher before we could take up the remains."

On cross-examination, the engineer testified that after he saw some object on the track he kept a constant lookout down the track; that the dogs did not move until the engine was within 100 to 150 feet from them, and that the boy did not move until he was hit, so far as the engineer observed, but that he could not see the boy after he was within from 60 to 70 feet from him because of the front part of the engine.

The fireman testified that a short time before the train reached the canal bridge he looked out of the cab and saw two dogs on the track. He also corroborated the testimony of the engineer as to the number of times that the whistle was sounded just prior to the accident. The engineer also testified that the body of the boy was about 400 feet from the rear end of the train after the train had stopped. The defendant also offered some evidence which tended to show that boys had not used the canal on the railroad right of way for swimming, but that such use as was made of the canal for swimming was near, but not on, the right of way.

The defendant contends that the foregoing evidence, viewed in a light most favorable to the plaintiff, is insufficient to support the verdict. No claim is made that the damages awarded by the jury are excessive, but it is urged that the Knutson boy was a trespasser at the time of the accident, and, as such, the defendant owed him no duty except to refrain from willfully or wantonly injuring him.

The adjudicated cases are not all in harmony as to the nature or extent of the duty which a railroad company owes

towards persons who, for their own purposes and without invitation, enter upon its tracks or other premises. All of the cases are agreed that a railroad company may not willfully or wantonly injure persons who are trespassing upon its premises. In some jurisdictions, such is the limit and extent of the duty which a railroad company owes to trespassers. In other jurisdictions, the servants of a railroad company, when operating a moving train, are required to keep a constant lookout ahead for trespassers who may be upon the railroad track. In still other jurisdictions, the rule is recognized that the servants of a railroad company are not required to keep a lookout ahead at places not frequented by people, but that they are required to keep a reasonable lookout ahead for persons who might be upon the tracks at a time when, or a place where, the company knows persons frequently and in considerable numbers use the track for either business or pleasure. This court is committed to the last-mentioned doctrine. *Hyde* v. *Union Pacific Ry. Co.*, 7 Utah 356, 26 P. 979; *Young* v. *Clark*, 16 Utah 42, 50 P. 832; *Corbett* v. *Oregon S. L. R. Co.*, 25 Utah 449, 71 P. 1065; *Teakle* v. *San Pedro, L. A. & S. L. R. Co.*, 32 Utah 276, 90 P. 402, 10 L. R. A. (N. S.) 486; *Smalley* v. *Rio Grande Western R. Co.*, 34 Utah 423, 98 P. 311; *Palmer* v. *Oregon S. L. R. Co.*, 34 Utah 466, 98 P. 689, 696, 16 Ann. Cas. 229; *Jensen* v. *Utah Ry. Co.*, 72 Utah 366, 270 P. 349.

When the evidence is not in conflict with respect to the use of the track and the surrounding conditions, it becomes a question of law whether the railroad company does or does not owe a duty to keep a lookout ahead of a moving train. *Jensen* v. *Utah Ry. Co.*, and *Palmer* v. *Railroad Co.*, supra. When, however, there is a conflict in the evidence as to the nature and extent that people generally have used the tracks of a railroad company at a given place, it may well become necessary to submit to the jury, under proper instructions for their determination, the question of whether a duty was or was not imposed upon

the railroad company to keep a lookout ahead of its moving train. In the case of *Palmer* v. *Railroad Co.*, supra, this court said:

"Again, the character of the place where the accident occurred may be in dispute, or the evidence may be conflicting as to the number of people who use the track and the character of the use. In all such cases the question cannot be determined as one of law, because the facts upon which the duty rests are in conflict. And if there is sufficient evidence to create a legal duty, the court must submit the question to the jury to determine whether the duty has been met or not. Under the facts as claimed by the defendant the duty may not have arisen, while under those as claimed by the plaintiff it may have. The court, therefore, must leave it to the jury to say which side shall prevail under proper instructions."

We are of the opinion that the evidence offered in the instant case on behalf of the plaintiff, when viewed in the light most favorable to him, was sufficient to entitle him to have the question of whether the defendant did or did not owe a duty to keep a lookout ahead submitted to the jury. Such was evidently the view entertained by the learned trial judge. Upon that phase of the case, he instructed the jury as follows:

"12. If you find that the deceased boy was a trespasser upon the railroad tracks of the defendant, at the time he was killed, then the railroad is not liable for his death unless you believe from the evidence that he was wantonly killed; in other words you verdict must be for the defendant, unless you find from the evidence that the engineer saw the deceased upon the track and proceeded without any regard for the life of the boy and without giving any signal of the approach of his train.

"The instructions that follow with reference to duty of operatives to look out and use reasonable care do not apply if the jury find the deceased was a trespasser, and the operatives of a train owe no duty to keep a lookout for trespassers.

"14. You are instructed that the burden of proof is upon the plaintiff to prove by a fair preponderance of the evidence that the railroad track and right of way of the defendant at the point where the deceased was struck was used habitually and continuously by the public, in considerable numbers, and for a long time and that such use was known and acquiesced in by the railroad company; and, unless you find by a preponderance of the evidence these facts, then the de-

ceased was a trespasser and the railroad company owed no duty to keep a lookout for him.

"15. If you find from the evidence in this case that for several years prior to the occurrence in question, many persons living, in Tremonton and in the vicinity of defendant's station and tracks have used the railroad right of way and track as a foot path and have walked and ridden animals along the right-of-way and track at and near the .place where Chester Knutson was killed, and have used the canal under the track and on the sides thereof as a swimming pool and have swam therein and have used the railroad bridge over said canal as a diving platform, and have stood thereon and dived therefrom into the canal, and that said track and grade, at and near the said canal, have been used as a playground by the children of the vicinity, and have herded their cows along and upon the said right-of-way and permitted them to eat and browse weeds and grass growing thereon, and that such use of said track and grade and right-of-way has been such as to become generally known to the employees of the defendant and to be common and customary, and, you are instructed that if the use was with the consent and permission of the defendant and that the defendant has acquiesced therein; and, if you find Chester Knutson went upon the railroad track under these circumstances, then he was a licensee, and not a trespasser upon defendant's right-of-way and tracks.

"16. The jury is instructed that if it believes from the evidence that the defendant's railroad track and right of way at the point where deceased was struck was only used by a few children going to and from swimming and in herding cows occasionally upon said right of way, that such use did not and does not constitute an habitual or continuous use of defendant's track and right-of-way."

Under the evidence in this case, the defendant has no just cause to complain of the instructions just quoted.

It is earnestly urged on behalf of the defendant that, even though it may be said that the Knutson boy was a licensee so long as he remained awake, he became a trespasser when he went to sleep·on the railroad track. Appellant cites a few cases which lend support to such contention. So far as the evidence discloses, the Knutson boy may or may not have been asleep at the time of, or immediately before, the accident. All the evidence discloses is that as the train approached him he was lying

motionless upon the track. Despite the noise made by the moving train, he did not move. He may have been asleep or he may have been rendered unconscious by the heat of the August sun or some other cause. Be that as it may, we are not impressed with the contention that the servants of a railroad company are required to keep a lookout ahead for persons who might be awake upon the track, but that no such duty exists towards persons who might be unconscious, and hence helpless, upon the track. Obviously, the latter is in greater danger of being injured than is the former. This court has held that the duty to keep a lookout ahead of a moving train is the same in the case of infants as it is in the case of adults. *Palmer* v. *Railroad,* supra. We can perceive of no good reason why the same rule should not include those persons who are unconscious as well as those who are possessed of all their faculties.

It is further contended that, even though the servants of the defendant owed a duty to keep a lookout ahead for persons who might be upon the track at the time and place of the accident, such duty was fully performed in the instant case by the engineer. If the jury were not at liberty to disbelieve the testimony of the engineer, the contention thus made would be meritorious. The testimony of the engineer is, in a number of particulars, disputed by the testimony of other witnesses. Thus the engineer testified that he applied the emergency brake at a point about 100 to 150 feet before the engine reached the bridge where the boy was lying. There is uncontradicted evidence in the record that the train would have stopped within 240 to 280 feet after the emergency brakes were applied. Yet the train must have gone about 800 feet after the engineer said he applied the brakes before it was brought to a stop. The train did not come to a stop according to the engineer's testimony until the rear end was about 400 feet north of where the body of the Knutson boy was found after the accident. The body of the boy was carried to a point about 125 feet north of the bridge. At the trial, counsel for the

defendant stated that the train was 160 or 180 feet long. The front part of the train thus traveled, after it is claimed the emergency brakes were applied, 100 to 150 feet to the bridge across the canal, 125 feet to where the body was found 400 feet to the rear end of the train, and an additional 160 or 180 feet to the front of the train. There is also testimony of two or three witnesses to the effect that the engineer did not sound the whistle at the times and places when and where he testified that it was sounded. The engineer testified that the boy was about the middle of the bridge when he was struck. A witness who visited the scene of the accident on the morning after the boy was killed testified that there was blood on the third tie south of the bridge, and it extended from there northward about 150 feet. Upon this record it cannot be said, as a matter of law, that the jury was bound to believe the version of the engineer as to how the accident occurred.

Complaint is also made on behalf of the appellant because the trial court gave the following instruction to the jury:

"20. If you find that Chester Knutson went upon the track of the defendant railroad company as a licensee and there fell asleep, then, even though you may find that such conduct was negligent, you are instructed that the negligence of the said Chester Knutson ceased at the moment he lost consciousness in sleep and you are instructed that so long as he remained asleep and oblivious to the danger attendant upon his position and unable to escape, the act of sleeping upon said track was not such negligence as will bar the plaintiff's action for damages if you should find that the defendant could, in the exercise of reasonable care, have discovered the perilous position of the said Chester Knutson in time to warn him and avoid striking him."

The trial court also gave the following instructions:

"18. If you believe from the evidence that the engineer saw the boy upon the track and applied his brakes upon the engine as soon as he realized that the boy did not hear the train approaching, and as quickly as a reasonably prudent man would have applied the brakes under the same or similar circumstances and was unable to stop his train before striking the deceased, then your verdict will be for the defendant, no cause of action.

"19. If you believe from the evidence that the engineer was keeping a lookout along the railroad track ahead of the engine and that as soon as he saw the deceased lying between the rails, he did all that a reasonably prudent man would have done under the same or similar circumstances, there can be no recovery, and your verdict will be for the defendant."

If the Knutson boy was asleep or for other reason was unconscious at the time in question, the so-called doctrine of last clear chance was clearly applicable. The three instructions last quoted are a correct statement of the law of last clear chance, as applied to the evidence in this case. There are some cases which hold that under the doctrine of last clear chance the duty to use reasonable care not to injure one who has negligently placed himself in a perilous position arises only after the peril of such person is discovered, and that there is no duty to keep a lookout for such a person. Under the doctrine of last clear chance as announced by this court, the breach of duty toward one who negligently places himself in the perilous position may arise before, as well as after, the discovery of the peril. Obviously, if there be no duty to keep a lookout for persons at the time when, and at the place where, a person is in a perilous position, such duty does not arise merely because such person is in a dangerous position. On the other hand, if there is a duty to keep a lookout for persons at the time when, and the place where, a person is in a dangerous position, the duty does not cease merely because the person is in a perilous position because of his own prior negligence. In such case, the prior contributory negligence is regarded as the remote, and the defendant's intervening negligence as the proximate, cause of the injury. Such is the established law in this jurisdiction. *Teakle* v. *Railroad,* supra.

The judgment is affirmed. Respondent is awarded his costs.

CHERRY, C. J., and STRAUP, FOLLAND, and EPHRAIM HANSON, JJ., concur.