NELLIE TEAKLE (as Administratrix of the Estate of Thomas W. Teakle, Deceased), Respondent, v. SAN PEDRO, LOS ANGELES and SALT LAKE RAILROAD COMPANY, Appellant.

No. 2014. Decided June 23, 1909 (102 Pac. 635).

1. APPEAL AND ERROR—DISPOSITION OF CAUSE—SUCCESSIVE APPEALS —"LAW OF CASE." The evidence adduced on retrial being substantially the same as that on the first trial, the decision of the Supreme Court on the questions presented on the former appeal is the "law of the case" on a subsequent appeal.[1] (Page 37.)

2. RAILROADS—INJURIES ON TRACK—ACTIONS—SUFFICIENCY OF EVIDENCE—PROXIMATE CAUSE. In an action for decedent's death by being struck by a train in defendant's yards, evidence held to sustain a finding that decedent only lost an arm when the first car passed over him, and that he would not have been killed if the train had been stopped before he was struck by the engine. (Page 41.)

3. RAILROADS—INJURIES ON TRACK—ACTIONS—SUFFICIENCY OF EVIDENCE—NEGLIGENCE. In an action for decedent's death by being run over by defendant's train, evidence held to sustain a finding that the train operators, by the exercise of reasonable care, could have discovered decedent's perilous position after he was struck by the first car which cut off his arm and before he was killed by the engine passing over him. (Page 41.)

4. RAILROADS—INJURIES ON TRACK—ACTIONS—INSTRUCTIONS—APPLICABILITY TO ISSUES. In an action for decedent's death by being run over by defendant's train by its negligence in failing to stop the train before the engine hit him after he had been run over by the first car, an instruction that decedent was concededly negligent in stepping in front of the approaching car so that, in order to recover, plaintiff must prove that the negligence of defendant's servants continued after decedent's negligence so as to proximately cause his death, and plaintiff could not recover if he was killed when he was first struck, but if defendant's failure to maintain a lookout on the car, or those on the car failed to look in the direction the train was going so as to see decedent's peril, and if they had done so the train could have been stopped before he was killed, plaintiff should recover,

---

[1] Potter v. Ajax Min. Co., 22 Utah 277, 61 Pac. 999.

together with other instructions to the same effect, did not authorize a finding for plaintiff because of defendant's negligence before decedent was first struck and knocked down by the train. (Page 43.)

APPEAL from District Court, Third District; *Hon. T. D. Lewis,* Judge.

Action to recover damages for personal injuries resulting in the death of plaintiff's intestate. From a judgment for plaintiff defendant appealed.

AFFIRMED.

Former Decision 32 Utah 276.

*Pennel Cherrington* and *George H. Smith* for appellant.

*Richards, Richards & Ferry* for respondent.

### APPELLANT'S AUTHORITIES.

Where damages are claimed for injuries which may have resulted from one of two causes, for one of which the defendant is responsible and for the other of which it is not responsible, the plaintiff must fail if his evidence does not show that the damage was produced by the former cause, and he must fail if it is just as probable that the damages were caused by the one as by the other, since the plaintiff is bound to make out his case by the preponderance of the evidence. (*Railway v. Poole's Ad.,* 40 S. E. 627; *Railway v. Heath,* 48 S. E. 508; *Searles v. Railway,* 101 N. Y. 661; *Shore v. Bridge Co.,* 11 Mo. App. 278; *Beckman v. Railroad,* 12 So. 956.)

### RESPONDENT'S AUTHORITIES.

The verdict of the jury will not be interfered with if there is any evidence to support it. (*Stoll v. Mining Co.,* 19 Utah 271; *Wild v. Union Pacific,* 23 Utah 265; *Garr v. Cranney,* 25 Utah 193.)

The determination of questions of facts rests conclusively with the jury. It is the duty of this court to give to the evidence introduced every fair intendment favorable to the contention of the plaintiff and every fair intendment to which it is entitled, to uphold the verdict. This court has so said not once, but many times. (*Lowe v. City,* 13 Utah 91; *Hall v. Railway,* 13 Utah 243; *Saunders v. Railway,* 13 Utah 275; *Dederichs v. Railway,* 13 Utah 34; *Handley v. M. Co.,* 15 Utah 176; *Reese v. M. Co.,* 15 Utah 453; *Anderson v. M. Co.,* 15 Utah 22; *Reddon v. Railway,* 5 Utah 344; *Seley v. Railway,* 6 Utah 319; *Andreson v. Depot Co.,* 8 Utah 128; *Woods v. Railway,* 9 Utah 146; *Smith v. Railway,* 9 Utah 141; *Hopkins v. Ogden City,* 5 Utah 390; *Short v. Pierce,* 11 Utah 40; *Larsen v. Onesite,* 21 Utah 38.)

It is not enough that the court inclines to the belief that the verdict should have been otherwise. It must be satisfied and clearly convinced that it was wrong and not supported by any evidence. Not only is this so, but, when a trial court has passed upon that question, with the added opportunities for observation, the decision of that court is entitled to some weight, and every presumption is in favor of its correctness. (*Corinne Co. v. Toponce,* 152 U. S. 405; *Pratt v. Clawson,* 7 Utah 254; *Cunningham v. Railway,* 4 Utah 206; *Bowers v. Railway,* 4 Utah 215; *Cunnington v. Scott,* 4 Utah 446; *People v. Chalmers,* 5 Utah 201.)

## STATEMENT OF FACTS.

Plaintiff brought this action to recover damages for the death of her husband, Thomas W. Teakle, which occurred October 10, 1905, in the yards of the Oregon Short Line Railroad Company, in Salt Lake City, Utah. The complaint, among other things, alleges that "the defendant so carelessly and negligently operated a train of cars propelled by an engine . . . over its tracks at the place above described, giving no warning of its approach, and failing to have any employee at the head of said train and without maintaining any proper lookout, which was being backed in an opposite

direction from which the locomotive was headed," and "ran into, knocked down the deceased, and ran over his left arm, mangling and severing it, and thereafter, after appreciating the peril of the said deceased, or being in a position whereby in the use of reasonable care or diligence it might have learned of and appreciated the position of peril of the said deceased, without any protection to him whatever, the said defendant carelessly and negligently continued to move said train in said direction without warning or stopping or making any effort to stop or relieve the deceased from his position of peril, and without any employee at the head of said train or maintaining any proper lookout, as aforesaid, and thereby ran its said locomotive on to and over the head, body, arms, and legs of the deceased, mangling and instantly killing him." Defendant, in its answer, admits the killing of the deceased, Teakle, but denies any negligence on its part, and alleges that the death of the deceased was due to his own negligence. A trial was had which resulted in a verdict for plaintiff in the sum of $12,500. Defendant moved the court for a new trial. On the hearing of the motion the court announced that, unless plaintiff would consent that the amount awarded her by the jury be reduced to $8000, a new trial would be granted. Plaintiff consented to the reduction, and agreed that judgment might be entered in her favor for $8000 only, which was accordingly done. To reverse the judgment the defendant has brought the case on appeal to this court.

The yards in which Teakle was killed are situated in a thickly populated section of the city, and at the time of the accident were uninclosed, and for several years prior thereto had been used by the people generally, "of all classes and all ages, and at all hours of the day," as a thoroughfare without let or hindrance on the part of the defendant, or its lessor, the Oregon Short Line Railroad Company. Numerous railroad tracks traverse these yards in a northwesterly and southeasterly direction. These tracks are connected with crossover and transfer tracks used in switching cars and transferring trains from one track to another. On the morning of October 10, 1905, an engine, a mail, and baggage car, in the order

stated, were cut off from a train in the yards standing on one of the main lines and near the depot. The engine and two cars mentioned were then sent north across North Temple street for the purpose of being switched over a transfer track east of the main line, so that when backed up again the engine and cars would be closer to the depot then when on the main line. As the engine and two cars were being backed in a southerly direction, and switched from one track to the other, Teakle, who was walking in the same direction that the train was being moved, stepped in front of the train and was struck by the baggage car, thrown between the rails of the track, and killed. Teakle fell with his head pointing south and his face to the ground, and, as testified to by one witness, "his left arm went out on the rail," and his "right was kind of semicircled in front of his head." The wheels of the car passed over his left arm which was extended across the rail, and severed it from his body. At the time of the accident, the train was moving at the rate of from three to five miles an hour, and continued to so move until the entire train had passed over Teakle. The weather was fair, and there was a clear and unobstructed view of the yards and tracks. The combined length of the engine and tender was seventy-four feet, and that of the mail and baggage cars one hundred and ten feet. The undisputed evidence shows that this train, moving at the rate it was, could have been stopped within the space of ten feet. Several witnesses for respondent testified that, as the train was being moved from the north and switched from one track to another, no signals or warnings of its approach were given, and that there was no one on the south end of the train to warn persons who might be upon the tracks, and to signal the engineer, in case of emergency. Upon the other hand, witnesses for appellant testified that, as the train moved back through the yards, a switchman by the name of Schell was on the east corner of the south end of it keeping a lookout, and that, when Teakle first stepped on the tracks upon which the train was moving, Schell "hollered" as loud as

he could and gave a signal to the engineer to stop. The engineer could not see the signal, because the train at that moment was on what is called a "reverse curve," which for the time being obstructed his view of Schell. Being unable to communicate with the engineer by signal or otherwise from the position he was in, because of the curve "elbowing" the train to the east, the side on which the engineer was standing, he (Schell) jumped off the train and ran around in front of it to the west side. On this point Schell, who was a witness for appellant, testified, in part as follows: "I jumped and ran around to the end of the cars and ran down on the west side of the train to get a signal to the fireman. I was giving signals and hollering all the time. I went up on the fireman's side and looked for him, but didn't see him." He further testified that he did not go north on the east side of the train, the engineer's side, when he jumped off the car, because there was a cinder pit full of red hot coals and ashes on the east side and in close proximity to the track at the point where Teakle was struck and knocked down, which made it dangerous for him to go north on that side.

Rayburn, a witness for plaintiff, testified: "That he was walking south in the yards a short distance in advance of Teakle, and saw him struck; that he ran north on the west side of the track towards the engine; that when he got opposite Teakle the center of the first car was passing over him; that he continued on a few steps in the direction of the engine and "hollered" for them (the men in charge of the train) to stop; that, failing to attract any one's attention, he ran back to where Teakle was; and that when he arrived there the first truck of the second car had just passed over him.

Several of appellant's witnesses testified that after the train started south the bell was rung continuously, and that before Teakle was struck the whistle was blown four times. The engineer and fireman both testified that they were at their posts in the cab of the engine keeping a lookout in the direction in which the train was going, but did not see Tea-

kle when he was struck, and did not know of him being on the track until after the train had passed over him. On this point, the fireman, who was called as a witness by the defendant, testified, in part, as follows: "I was on the lookout on the left or west side of the engine as we were backing. I was looking in the direction the train was moving. I didn't see anything unusual. . . . I saw no signals given to stop. There were people in the yard, but I didn't see Schell. I don't know whether he gave any signals from the west of the train or not."

This case was before this court on a former appeal (32 Utah 276, 90 Pac. 402, 10 L. R. A. [N. S.] 486), and the opinion, which was written by the present Chief Justice, contains an elaborate and detailed statement of the facts and circumstances of the case leading up to and surrounding the accident. It is conceded that the evidence in the record before us is substantially the same as the evidence contained in the record on the former appeal. Therefore, for a more full and detailed statement of the facts, we refer to our former opinion in the case.

McCARTY, J. (After stating the facts as above.)

The general duty which the appellant owed the traveling public—who for years had been permitted, without objection, to use the yards in question as a thoroughfare—to exercise reasonable care in operating its trains and locomotives, to avoid injury to persons who might pass along or over its yards, and the duty of such persons to look out for their own safety when using the yards as a thoroughfare, were fully discussed, and the rights and reciprocal duties of appellant and the deceased, under the facts and circumstances of this case, were determined by the former opinion of this court. (*Teakle v. Railroad Co.*, 32 Utah 276, 90 Pac. 402, 10 L. R. A. [N. S.] 486.) In the course of the opinion it is said: "There is much reason for the distinction that the railroad company should not be held liable in case of an actual or conscious trespasser until his position of danger is discovered, and should be held liable in case of one not a trespasser ex-

posed to peril through negligence, not only after the consequences of such negligence have been discovered, but which ordinarily could have been discovered, if there was a breach of duty continuing or intervening after the commission of the contributory negligence. In the one instance the train operatives were not called upon to expect or anticipate the trespass or the presence of persons, and hence owed no duty of lookout or of giving warnings. . . . If, upon the other hand, through a long usage or custom the public has made a thoroughfare of the track in a populous city or thickly settled community, though not with any express authority, but under circumstances of an implied license, the train operatives are required to reasonably expect and anticipate the probable presence of persons on or near the track at such place, and there is consequently imposed on the train operatives a duty toward such persons of a reasonable lookout. . . . Notwithstanding such duties imposed on the train operatives, the deceased was himself in duty bound to observe a reasonable lookout for his own safety, and to exercise all reasonable care, commensurate with the attending dangers, to avoid coming in contact with cars and trains being moved and operated in the yard. He was at a place where cars might momentarily be expected. He had an unobstructed view of the premises, and there was nothing to divert his attention or to prevent him from seeing or hearing the approach of the cars. His act of walking or stepping on the track in front of the moving train without observation, as shown by the evidence, rendered him guilty of negligence as matter of law." Then follows a discussion of the "last clear chance" doctrine, after which the following observations are made: "The duty which the train operatives owed the deceased of observing a reasonable lookout existed before he was struck by the train, as well as thereafter. The proffered evidence should therefore be considered not only with respect to duties owing from the engineer, after he had knowledge of the deceased's exposed peril, but also with respect to duties owing from the train operatives continuing or intervening after the commission of the de-

ceased's negligence, which, had they been performed with reasonable care on their part, would have disclosed to the engineer the peril of the situation in time sufficient to have avoided the fatality. . . . When the deceased was struck by the train and rendered helpless, the effect of his antecedent or contributory negligence was spent. Plaintiff then had the right to show, if she could, a breach of duty on the part of the train operatives intervening or continuing thereafter which was the proximate cause of the death."

It being conceded that the evidence given at the first trial was substantially the same as that produced at the last trial, the decision of this court of the questions presented on the former appeal became and is the law of the case. (*Potter v. Ajax Min. Co.,* 22 Utah 277, 61 Pac. 999; 2 Spelling, New Tr. & App. section 691; 5 Words and Phrases, 4024; 2 Ency. Pl. and Pr. 373.) The case on this appeal is therefore practically narrowed down to two propositions. The first involves the question as to whether or not the evidence is sufficient to support a finding by the jury that Teakle, notwithstanding the injuries he received by being struck by the train in the first instance and run over by the forward truck of the foremost car, would have survived if the train had been stopped before he was hit by the engine? And the second involves the question as to whether the operatives of the train, notwithstanding the negligence of the deceased in going upon the track without looking or listening for the cars, could, by the exercise of such care and diligence as a reasonably careful and prudent person would have exercised under like conditions and circumstances, have discovered the deceased's position of peril after he was struck and thrown under the cars and his arm severed from his body, in time to have stopped the train and saved his life? In other words, stated in a more condensed form, the case as now presented involves the question of the sufficiency of the evidence to show: (1) Whether there was any continuing or intervening negligence on the part of the train operatives after the deceased was struck by the train and rendered helpless; (2) whether the proximate

cause of his death was due to that negligence, or to his own negligence; and (3) whether the injuries received by him when he was first struck by the train, or when he was hit by the engine, caused his death.

The case involves, and in fact was tried by the lower court upon, the "last clear chance" doctrine. Counsel for respondent, in their printed brief, have tersely, and, as we think, correctly, stated the case as presented by this appeal, as follows: "It has been decided, and it is conceded, that deceased was guilty of contributory negligence, and that no recovery can be had for the loss of his arm; also, that no recovery can be had for his death, except upon the ground of (appellant's) negligence continuing and intervening after the effect of his contributory negligence had been spent, and without which (continuing and intervening) negligence" the life of the deceased could have been saved. When respondent rested her case, appellant moved the court for a nonsuit on the ground that the evidence failed to bring the case within the "last clear chance" doctrine, "not having shown or tended to show that the deceased was alive after the results of his contributory negligence," and, further, that "there is no evidence that Teakle was not killed when struck, thrown upon the ground, and passed over by the first trucks of the first car." The order of the court overruling the motion is assigned as error. At the close of the case appellant requested the court to peremptorily instruct the jury to return a verdict in its favor. The refusal of the court to thus direct a verdict is also assigned as error. As both of these assignments of error relate solely to the alleged insufficiency of the evidence to justify a verdict against appellant, they will be considered together. The contention of appellant with respect to the question presented by these assignments is clearly set forth by its counsel, in their brief, as follows: "She (respondent) has not sustained the burden of proof that was upon her to show that the failure to stop the train after deceased was struck was the proximate cause of his death, and this is so because there is no evidence in the record that can be pointed out tending to show that Teakle would

have survived his first injuries, or tending to show even that the injuries sustained by reason of his own negligence did not cause his death." Counsel then proceeds to argue that Teakle was killed by being run over by the first or forward truck of the car with which he first came in contact, and that therefore recovery is barred by his own negligence, which contributed to his death, and without which negligence the accident would not have happened.

John Elkins, a witness for plaintiff, who was in the yards south of Teakle when the accident occurred, testified, in part, as follows: "I heard some one yell and turned around just in time to see Mr. Teakle step on the track and the train push him over. I stepped back even with where he was. I came up on the west side of the train and stood nearly opposite where he was lying. I saw the north trucks of the first car pass over him, though they did not touch him that I could see. They did not move him. While his left arm was stretched out, the right was kind of semicircled in front of his head. His head was face down. I saw him move. When I reached there he was apparently alive. His head was not injured that I could see, nor his clothes disarranged. The wheel had run over his left arm between the elbow and wrist. After I got there his position did not change at all until the engine or fire box struck him—only the wheel of the first car that passed over him interfered with him. The second car didn't interfere with him at all that I could see, nor did the engine tender. I was there looking at him. If it had disturbed him I would have seen." On cross-examination he testified that he was between thirty and forty feet from Teakle when he was struck, and was about three or four feet west of the track on which the accident occurred. "As the car approached I would be looking right into the end of it. . . As I ran north I didn't take my eyes off Teakle. The front part of the train pushed Teakle over, and the wheel caught his arm. No other part of the train struck him until the fire-box hit him. . . . He threw out his hand evidently to protect himself or get hold of something. . . . No other part of the train struck him until the fire box hit him. . .

I didn't hear Teakle speak as he lay there, nor cry out. I say Teakle was alive when the cars passed over him, because he moved his head and seemed to be conscious of what he was doing. He crouched his head down just once and held it down after he got it there. Q. Can you tell the jury with any assurance whether the motion you saw was voluntary or involuntary on Teakle's part? A. Voluntary. Q. How do you know that? A. Because he moved it himself. Q. Yes, but he didn't speak did he? A. No, sir; I didn't hear him. Q. So that when you say that he voluntarily and intentionally lowered his head, that is simply surmise, is it not? A. Yes, sir. Q. That is simply the way it appeared to you? A. Yes, sir. Q. For aught you know, the motion you say might simply have been an involuntary relaxing of Teakle's muscles? A. I think not. Q. I say, not what you think, but for aught you know? A. Yes. Q. So you cannot say to this jury of your positive knowledge that Teakle did lower his head with the idea of protecting himself? A. No, sir; not with positive knowledge."

On this point the witness Rayburn testified: "I saw Teakle struck. He was hit by the back of the car, and it pushed him over. He fell down. When I reached him the center of the first car was passing over him. He was lying face down, with his right arm in front of his face. His left arm was on the rail. His hat was off, and his scalp and head were not bruised at all, or cut. His clothes were not damaged, and there was no blood other than at the point where the wheel ran over his arm. . . . I watched him there till the train passed over him up to the fire box. Up to the time the fire box struck him he remained in the same condition in which I first saw him after falling. . . . Teakle got through all right without the brake beam hitting him. When the fire box struck him, it rolled him over and mangled him up. After the train passed over him, he lay just a few yards south of the point where the fire box struck him with his head to the north. Before the fire box struck him, it was pointing south."

Earl Gill, another witness for plaintiff testified: "He

was lying face down with his left arm over the rail and his right arm around his head. His hat was off, and his head was all right. His body and clothing with the exception of his left arm, had not been disturbed. There was blood running from his left arm, but not from any other part of his body. He remained in that position without further injury from the train until the engine got to him. I was still watching him and saw the fire box hit him; that is, the ash pan. He passed under the ash pan, and when the engine passed over him he lay fifteen or twenty feet south of the point where I saw him pass under the ash pan. He was all doubled up, mangled, and his head was badly cut. He was practically scalped. His head was lying to the north, though, at the time he originally fell, it was to the south."

The foregoing is practically all the evidence introduced by respondent in support of her theory that the only serious injury received by Teakle, when the first truck of the foremost car passed over him, was the loss of his arm, and that, if the train had been stopped before he was hit by the engine, his life would probably have been saved. We think the evidence is sufficient to support a finding by the jury in accordance with this theory. We are also of the opinion that there was sufficient evidence to support the findings of the jury that the operatives of the train, by the exercise of that degree of care and diligence which a reasonably careful and prudent person would ordinarily use under the same or similar circumstances, would have discovered Teakle's perilous position after the first truck of the foremost car had passed over him, and his contributory negligence had spent itself, and that they could have stopped the train in time to have saved his life. The undisputed evidence shows that the accident occurred at a point about seventy feet north of the north line of North Temple street. H. L. Johnson, a witness for defendant, testified: That he was standing "in the middle of the crossing at North Temple street," when Teakle was first struck by the train; that he "stood there five or ten seconds kind of spell bound," and then ran north along the east side of the track

(a distance of about seventy feet), and, when he got opposite of where Teakle was lying, the last truck of the second car was passing over him. Witness Elkins testified that he was between thirty and forty feet south of Teakle when the accident occurred, and that he ran north on the west side of the track and got to where Teakle was lying just as the first truck of the second car passed over him. Witness Rayburn testified that he was "just south of North Temple" street when Teakle was first struck by the train. According to a map conceded to be a correct representation of the yards, tracks, and streets in the vicinity of where the accident occurred, Rayburn was over two hundred feet south of Teakle when he was struck. This witness further testified: That, when he saw Teakle struck by the train, he ran north on the west side of the track in the direction of where Teakle was lying; that he passed beyond him a few steps shouting to the operatives of the train to stop it, but failing to either see or attract their attention, he retraced his steps to a point opposite to where Teakle was lying under the train, just as the center of the foremost car was passing over him. Schell, the brakeman, whose duty it was to keep a lookout on the south end of the train, as it moved backwards through the yards, and to signal the engineer and fireman in case of danger, testified that he was on the southeast corner of the forward car, and, when Teakle started to cross the track in front of the moving train, he (Schell) shouted to him as loud as he could and gave a signal to the engineer to stop the train; but the train being on a curve at the time, the engineer was hidden from his view, and did not get the signal. Being unable to get a signal to the operatives of the train from the east side, Schell jumped off and ran around in front of the moving train and up along the west side of it shouting and signaling, but failed to attract the attention of either the engineer or fireman. Schell testified that, when he got over on the west side of the train, he looked for the fireman, but did not see him. John Carlson, another witness for defendant, testified: That he was tower watchman, and on the morning of the accident he was at his post of duty in a tower situated in the yards re-

ferred to, and on the north line of North Temple street; that he saw Teakle struck by the train. Further testifying, he said: "What attracted my attention was the switchman hollered, and I looked to the north. . . . I know Switchman Schell. He is the one that hollered after Teakle was struck. He jumped across, ran across, the tracks to the west side and gave signals to the fireman to stop." The evidence, without conflict, shows that the train was moving slowly, and could have been stopped within a space of ten feet. Now, if the testimony of these witnesses is to be believed, and that was a question of fact for the jury to determine, the jury, as we have stated, might well have found that if the engineer and fireman, and especially the fireman, had been keeping a proper lookout in the direction in which the train was moving, and exercising that degree of care and diligence which a reasonably careful and prudent person would ordinarily use and exercise, under the same or similar circumstances, one or more of the persons who rushed towards the train shouting and signaling, when they saw Teakle struck, would have attracted the attention of one or both of them, in time for them to have stopped the train before Teakle was hit by the engine.

The court, among other things, instructed the jury, as follows: "(4) In this case the court instructs you that under the evidence of the plaintiff's own witnesses the deceased, Thomas W. Teakle, in stepping upon the railroad track in front of an approaching car in the manner in which plaintiffs witnesses testified that the deceased stepped upon the track, was himself guilty of negligence, and therefore the court instructs you that in order to recover in this case the burden is on the plaintiff to prove by a preponderance of the evidence: First, that the defendant's servants in charge of or operating the train were guilty of negligence continuing or intervening after the negligence of the deceased, and that such negligence of the defendant was the proximate cause of the death of said Teakle. . . . (15) The plaintiff concedes that, at the time the deceased was struck, he was guilty of contrib-

utory negligence, and that for injuries sustained by him up to this time there can be no recovery. If, however, you believe from the evidence that the negligence referred to—that is the failure to maintain such operative as a lookout, or the failure of those upon the car to look in the direction in which the train was backing—continued after the deceased was knocked under the car, and that his death was caused by this negligence, and if it had not existed, the defendant would have been enabled to stop the train before the deceased was killed, then your verdict must be for the plaintiff for the death of the said Thomas W. Teakle."

It is contended that under these instructions the jury might very properly have found the issues in favor of plaintiff on account of defendant's negligence prior to the time that Teakle was first struck and knocked down by the train. We do not think the instructions are open to this objection. Not only did the court say to the jury in these instructions that the deceased was guilty of contributory negligence when he stepped upon the track in front of the moving train, and that no recovery could be had for injuries sustained by him from his first impact with the train; but the court, in the ninth instruction charged the jury that: "The undisputed evidence of the plaintiff's witnesses shows that he stepped upon such track in front of the moving train, when but to look or otherwise use ordinary care on his part would have disclosed to him the approach of the train. The court further instructs you that such negligence on the part of the deceased was a concurring and contributing cause of the collision and bars all right of recovery for whatever injury proximately resulted from such collision." In the sixteenth instruction the jury were told that: "If the deceased was killed when he was first struck by the train, the plaintiff could not recover." In the eighteenth instruction the court charged: "You are further instructed that it was the duty of the deceased, Thomas W. Teakle, before attempting to cross or walk upon the railroad track upon which he was injured, to look and listen to ascertain the presence of any locomotive or train of cars that might be approaching thereon; and, if you believe from the evidence that

said Teakle did attempt to cross or walk upon said track without looking or listening for the approach of a locomotive or train, such failure on his part to look and listen was such negligence as would bar a recovery by the plaintiff in this action, and your verdict should therefore be for the defendant, unless you find from the evidence that the men in charge of the train which ran over him could, in the exercise of ordinary care, have avoided the consequences of the deceased, Thomas W. Teakle's negligence; for if the train in question, in the exercise of ordinary care, could not have been stopped in time to have avoided the death of Teakle, no liability has been shown on the part of defendant for his death." And, again, in the nineteenth instruction, the court said: "Therefore, if you find from the evidence that the plaintiff has failed to prove by a preponderance of the evidence that Teakle would have survived but for the failure of the men in charge of the train to exercise ordinary care to stop the same, after Teakle was struck by the train, or if you find that the evidence was equally balanced on the question, your verdict should be for the defendant."

It will thus be seen that the court clearly and repeatedly charged the jury that the deceased in stepping upon the track in front of the train was guilty of negligence, and that such negligence was a contributing and concurring cause of the collision, and that no recovery could be had for any injury which proximately resulted from such collision; also, that the burden was upon plaintiff to show, by a preponderance of the evidence, that defendant was guilty of negligence continuing or intervening after the negligence of deceased, and that such negligence was the proximate cause of his death. This assignment is without merit, as the instructions are not susceptible of the construction which counsel suggest the jury might have given them.

The judgment is affirmed, with costs to respondent.

STRAUP, C. J., and FRICK, J., concur.