## Cincinnati, New Orleans & Texas Pacific Railway Company, et al. v. Harrigan, Admx., et al.

(Decided June 14, 1912.)

### Appeal from Jessamine Circuit Court.

1. Railroads—Injury to Trespasser—Duty Toward—Rule as to Such Duty in City and Country.—A railroad company ordinarily owes no duty to a trespasser until his peril is discovered, and it is not liable for an injury to him, unless after his peril is discovered the injury to him could have been avoided with proper care. This rule has been applied in all cases where the injury occurred in the country; but in cities and towns, where the population is dense, and from the number of persons passing the danger to life is great, a different rule applies; and, in such localities, it is the duty of those operating a railroad train to moderate its speed, give notice of its approach, keep a lookout, and take such precaution as the circumstances demand for the proper security of human life.

2. Railroads—Use of Track by Public as Passway—Duty to Keep Lookout.—Where the track and switch yard of a railway company was frequently and habitually used by the public as a footway, with the knowledge and acquiescence of the railway company, and was a place where the presence of persons on the track was reasonably to be anticipated, it was the duty of those in charge of the engine used in switching cars on the tracks to keep a lookout for persons using the track as a footway, and to give reasonable signals and warnings of the movements of the cars.

3. Railroads—Use of Track as Passway—Evidence—Submission to Jury.—Where the tracks and yard of a railroad company were within the corporate limits of a city having 3,000 inhabitants, and ten witnesses testified that they had repeatedly seen residents of the town use the railroad tracks as a passway, there was sufficient evidence to authorize the submission to the jury

of the question whether such passway was sufficiently general to bring it within the rule above announced.

R. A. THORNTON, N. L. BRONAUGH and JOHN GALVIN for appellants.

W. P. KIMBALL, D. C. HUNTER and W. M. WATTS for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

This appeal seeks to reverse a judgment for $7,500 damages recovered by appellee for the death of her husband, alleged to have been caused by the gross negligence of the appellants in handling a freight train in its yard in Nicholasville, on January 7, 1910. The appellants denied the negligence, and relied upon Harrigan's contributory negligence to defeat the action.

For many years the appellant company has maintained its railroad yard in Nicholasville substantially as it now exists. At the north end of the yard where the train goes through a cut, an overhead bridge, across which the Versailles & Nicholasville Turnpike passes, spans the yard and cut. Only the main track passes under the bridge; the other tracks in the yard lie south of the cut. Immediately west of the main track and running parallel with it, is what is known as the "passing track." The main track and the "passing track" run along and near the west side of the passenger and freight depots, which lie immediately to the east of the main track, the passenger depot being about 400 feet south of the bridge. The freight depot is about 100 feet south of the passenger depot; and a short distance south of the freight depot is the northern switch point of the "stock track," which there leaves the main track on its east side; and after running thence south and parallel with the main and "passing" tracks along the stock pens, it again runs into the main track at the south end of the yard. There are several switches extending out on the east from the stock track to houses and a grain elevator that stand in that neighborhood. A water column stands immediately upon the west side of the main track and opposite the intervening space between the two depots. This water column is 282 feet north of the switch point where the stock track joins the main track. On the west of the "passing" track and nearly opposite the water column is the flour mill of the Star

Milling Company, with a "mill" track or spur leading to it from the passing track. On this mill track or spur there was a car which had to be taken out and placed in the local freight train No. 92, which arrived at Nicholasville from the south about 9 o'clock on the morning of January 7, 1910. In order to put this car in its proper place in the train, the train had to head into the "mill" track, attach the car to the engine, and then back out onto the "passing" track. The train then moved north past the depot, and through the switch connecting the "passing track" with the main line, and out on to the main line. The train was then backed down the main line to the lower end of the yard, where it was cut in two, leaving the engine, with the car that had been taken from the mill track, attached to it in the front, and two other cars attached to it behind the tender. The remaining portion of the train was left standing on the main track south of the stock pens. The engine, which was drawing two cars which were in the rear of it, and pushing in front of it the car which it had picked up on the mill track, then went north on the main track, passing the north switch point of the main track, to the water column, where it stopped and took water. After the engine had taken water, the crew proceeded to make the movement necessary to get the car that was in front of the engine in its proper place in the train and behind the engine. To do this it was necessary to make a running switch. This was done by first starting the train south with sufficient speed to give it momentum, and by uncoupling the engine and the two rear cars from the front car and turning the switch that led on to the stock track, at the proper time, so that the engine going backward, and pushing the two rear cars in front of it, would pass on to the stock track; and by a quick throwing of the switch, the car which had been detached from the front of the engine would pass down the main line. All that remained then to be done was for the engine to pass back northwardly on to the main line and back down against the car which had been switched down the main line.

When first seen on the morning of the accident, the decedent, Joseph Harrigan, was in the waiting room of the passenger depot. He was not then in the service of the appellant company although he had theretofore served it for many years as a section hand and foreman. After remaining in the passenger station for some time,

Harrigan went out while the engine was taking water at the water tower between the passenger and freight depots, and spoke to Jones, the engineer in charge of the engine, asking him "if they were going to get away before No. 5;" and Jones answered he didn't know whether they would, or not. No. 5 was a passenger train from the south. Conductor Haney was then walking from the water column northeast to the passenger depot, and met Harrigan and spoke to him. He did not then know Harrigan, but subsequently recognized his dead body as that of the man to whom he had spoken. Neither Jones nor Haney knew where Harrigan then went, and neither of them saw him again until after he was killed. Preparatory to making the running switch for the purpose of dropping the car down the main track, Conductor Haney took his position on the car which was in front of the engine, and Carey, the brakeman, took his position at the north switch stand where the stock track joins the main track, for the purpose of throwing the switch. While Carey was standing there, Harrigan walking southwardly, passed the switch, walking between the house switch and the main track. Carey's attention was naturally fixed upon the approaching engine and he paid no further attention to Harrigan. As Harrigan passed southwardly from the water tower to the switch he passed Bohannon, one of the brakemen on train No. 92, just before he met Carey. Hampton, a third brakeman, was standing some distance south and near the stock pens, checking up the cars which had been sent down there as above stated. He was about 60 or 70 yards from the north switch point where the accident occurred. Hampton says he saw Harrigan walk on the stock track about 40 or 50 feet south of the point of the house track switch, and walk straight on down the middle of the track southwardly. In the meantime, Carey and Jones were making the switch, and had turned the engine, which was running backwards, and pushing the two cars in front of it, on to the stock track immediately behind Harrigan, who was walking southwardly upon the stock track. When Hampton saw Harrigan's danger, he immediately signaled the engineer to stop his engine, and Jones obeyed the signal, although he did not know the reason for it. Before the engine was stopped the front box car struck Harrigan and passed over his body, which was taken from the track between the first and second car. It was a very cold morning, with the thermometer

standing at about zero, and with a heavy coat of snow, from six to eight inches deep, upon the ground and tracks.  Hampton and Jones both say that Harrigan had on a cap, with ear flaps on it, and that he had it pulled down over his ears, just as far as he could pull it.  No witness, except Hampton, saw Harrigan after he passed Carey at the switch until after he was killed.  There was no one upon the front of the box car that struck and killed Harrigan; and it is not shown that the engine was ringing its bell or giving any sign of its approach.

The several grounds relied on for a new trial may be classified as follows:

(1) The court should have sustained defendant's motion for a peremptory instruction;

(2) The court erred in permitting the plaintiff to show the use of the road at the place where the accident occurred by the public as a passway for travel;

(3) Error in giving instructions and in refusing instructions; and,

(4) The verdict is excessive, and is not sustained by the evidence.

Appellant insists that Harrigan was a trespasser in the private yard of the company; that he had no right to be at the place where he was killed; that the appellant owed him no lookout duty, and was not guilty of a breach of any duty which it owed him in not having discovered, by the exercise of ordinary care, his presence in a place of danger in time to have prevented the accident; and further, that his death was caused by his own negligence, in having voluntarily gone into its private yard, where he had no right to be, and there negligently walking upon the tracks of the company in a dangerous place. On the other hand, appellee's theory of the case is, that it was the duty of the defendant company to keep a lookout on the cars which were being moved at the time of the accident, for the purpose of discovering the presence of any person or persons who, at the time of the accident, might be in the yard, or on, or so near to any of the tracks where Harrigan was killed as to be in danger from the moving of the cars.  In other words, appellant insists that Harrigan was a mere trespasser, to whom it owed no duty of lookout, and only the humane duty of not injuring him after his perilous condition was actually discovered by the trainmen; and, there being no evidence tending to show that those operating the

engine knew of Harrigan's presence, the appellant's motion for a peremptory instruction should have been sustained.

These yards were entirely within the corporate limits of Nicholasville, a city of about 3,000 inhabitants. They were unfenced, and aside from the road passing over the over-head bridge at the cut north of the passenger station, there was no public passway over the tracks of appellant's yard in that immediate neighborhood. The consequence was, that the people of the neighborhood, as is inevitably the case in all such neighborhoods, would cross the track indiscriminately, and at their pleasure. In addition to the mill opposite the station and west of the "passing" track, there was one residence lying to the northwest of the mill; but both the mill and this residence were connected by a road with the Versailles pike at a point west of the cut. People traveling by buggy, either from this house or the mill, were necessarily compelled to pass northwardly to the Versailles pike, and thence eastwardly over the bridge into the town; but pedestrians were in the habit of crossing the tracks of the company from the mill to the depot and to the grain elevator which stood near the freight depot on the east side of the track.

Considerable testimony was taken tending to show the extent of this use, and it is to this testimony that objection was made by appellant upon the ground that it did not show a sufficient use to justify the submission of that question to the jury. It is sufficient to say, however that ten witnesses testified that they had seen people at different times use a pathway across the tracks in going from the town to the mill and other places on the west; and, although most of them saw only a few trespassers at a time, and perhaps only a few times, one of the witnesses testified to having seen as many as twenty-five boys passing over the tracks to a vacant lot on the west for the purpose of playing ball. The substance of the testimony upon this point is, that whenever pedestrians had occasion to cross the tracks in this immediate neighborhood, either for the purpose of going to the mill, or elsewhere, and were not sufficiently energetic or careful to walk up to the over-head bridge, they would walk over the tracks when and as it suited their convenience. To say that this was not an unusual, but on the contrary, was the usual state of case under circumstances of this

character, is merely to announce a condition that is generally known to all persons in a city of any size. This evidence was sufficient to carry the question of the use of the tracks to the jury. What then was the duty of the appellant to the public? Did it have the right to run its trains as it pleased, without taking the precaution of having a lookout for persons who might be expected to be crossing the tracks at this point?

The rule was clearly announced in L. & N. R. R. Co. v. McNary's Admr., 128 Ky., 408, where we used this language:

"This court has laid down in a long line or opinions that the railroad company ordinarily owes no duty to a trespasser until his peril is discovered, and that it is not liable for an injury to him, unless after his peril is discovered the injury to him may be avoided with proper care. This rule has been applied in all cases where the injury occurred in the country. L. & N. R. R. Co. v. Howard's Admr., 82 Ky., 212, 6 Ky. L. R., 163; Shackelford's Admr. v. L. & N. R. R. Co., 84 Ky., 43, 7 Ky. L. R., 729, 4 Am. St. Rep., 189; Brown's Admr. v. L. & N. R. Co., 97 Ky., 228, 17 Ky. L. R., 145, 30 S. W., 639; Goodman's Admr. v. L. & N. R. R. Co., 116 Ky., 900, 77 S. W., 174, 25 Ky. L. R., 1086, 63 L. R. A., 657; C. & O. R. Co. v. See's Admr., 79 S W., 252, 25 Ky. L. R., 1995, and cases cited.

"On the other hand, in cities and towns where the population is dense, and from the number of persons passing the danger to life is great, a different rule applies; and in such localities it is the duty of those operating railroad trains to moderate the speed of the train, to give notice of its approach, to keep a lookout and take such precautions as the circumstances demand for the proper security of human life."

The court not only proceeds, in the McNary case, to examine the leading Kentucky cases of L. & N. R. Co. v. Schuster, 10 Ky. L. R., 65, 7 S. W., 874; Conley's Admr. v. The C. T. P., &c., R. R. Co., 89 Ky., 409; Gunn v. Felton's Receiver, 108 Ky., 568; C. & O. R. R. Co. v. Perkins, 20 Ky. L. R., 608, 47 S. W., 259; L. & N. R. Co. v. McCombs, 21 Ky. L. R., 1233, 54 S. W., 179; C. & O. R. Co. v. Keelin's Admr., 22 Ky. L. R., 1942, 62 S. W., 261, and Shelby's Admr. v. The C., N. O. & T. R. R. Co., 85 Ky., 284, but also cites in the opinion many other Kentucky cases supporting the doctrine.

See, also, L. & N. R. R. Co. v. Hoskins' Admr., 32 Ky. L. R., 1263, 108 S. W., 305; I. C. R. R. Co. v. Murphy's Admr., 123 Ky., 787; I. C. R. R. Co. v. Flaherty, 139 Ky., 148; and I. C. R. R. Co. v. Dick, 91 Ky., 434.

In concluding its review of the authorities in the McNary case, the court said:

"To hold as a matter of law that the footman is guilty of contributory negligence barring a recovery for his injury whenever he goes upon a railroad track without stopping, looking or listening, would be practically to exempt railroads from all responsibility in cases of this sort; for there are few cases indeed where the footman if he stopped, looked or listened could not save himself by stepping to one side and waiting for the train to pass. But the fact is that a person thinking of his own business is sometimes unmindful of where he is, and will get on the railroad track before he is aware of it, or he will from other causes be endangered from passing trains. So it is that in crowded localities, when the presence of persons on the track is to be anticipated, a lookout is required of those operating trains, and notice of their approach and such moderation of speed as will make a lookout and signals of the train's approach available for the safety of the traveling public. In each case the question whether the traveler used proper care will depend on a number of circumstances, such as the number of trains passing, the warning of the train's approach, and the circumstances surrounding him. In this State if there is any evidence the question is for the jury, and the scintilla rule applies to questions of contributory negligence no less than to other questions. Where the scintilla rule does not prevail, a different conclusion is reached by the courts, but where the scintilla rule is followed, the cases are in the main in accord with the conclusion stated above, for the reason that whether the traveler exercised such care as may be ordinarily expected of the common run of persons being a question depending on a number of circumstances, to each of which different men may give different weight, is a matter peculiarly for the jury."

The doctrine here explicitly anounced and repeatedly recognized by this court is not in conflict with the cases cited by appellant; it is only in its application to specific cases that excuses the company from keeping a lookout in one class of cases, and imposes that duty in the other.

In country districts and thinly settled communities there is ordinarily no lookout duty required of railroads; in cities, towns and thickly settled communities, where the presence of persons upon the track may reasonably be expected, there is such duty, though they be technically, trespassers. This distinction is well and thoroughly established in this jurisdiction.

Without further citation of authority, or elaboration, it is clearly apparent that the authorities above cited fully warranted the circuit judge in over-ruling the defendants motion for a peremptory instruction, and in admitting the evidence which tended to show the use of the tracks by the public.

The objection to the instructions is confined to instruction No. 1, which reads as follows:

"If the jury believe from the evidence that the track or switch yard on the defendant railway company at and about the point where Joseph Harrigan was killed, was frequently and habitually used by the public as a footway, with the knowledge and acquiescence of the defendant, railway company, and was a place where the presence of persons on the track was reasonably to be anticipated, then it was the duty of the persons in charge of the engine and cars, when moving cars on that part of the track, to keep a lookout for persons using the track as a footway and to give reasonable signals and warnings of the movements of the cars, and if the jury further believe from the evidence that the employes of the defendant company in charge of the engine and cars mentioned by the witnesses negligently failed to perform that duty in the movement of said engine and cars, and that by reason thereof said Joseph Harrigan while upon or near the track at said place was struck and killed by a car or cars, and that he was at the time using ordinary care for his own safety, the jury should find for the plaintiff, and fix the damages according to the 4th instruction."

It is sufficient to say that this and the other instructions given in this case, are substantial copies of the instructions approved in the McNary case. See, also, C. N. O. & T. R. R. Co. v. Mayfield's Admr. 145 Ky. 305.

Neither is there any merit in the contention that the verdict is excessive. Harrigan was about fifty years of age and was an active and healthy man, earning from forty to fifty dollars a month. He had an expectancy of life which, at that rate, and without any enhancement

in his wages, would have yielded him more than the amount of the verdict, even though his measure of recovery were based, as appellant contends it should be, upon the amount of money which he could have earned. Under the repeated decisions of this court, this is not a case that would authorize us to set aside the verdict as excessive.

Judgment affirmed with damages.