## ELBERT OGLE v. KNOXVILLE POWER & LIGHT CO.

Eastern Section. February 11, 1928.

Petition for Certiorari denied by Supreme Court, July 14, 1928.

Johnson & Cox, of Knoxville, for plaintiff in error.
Chas. H. Smith, of Knoxville, for defendant in error.

PORTRUM, J. This suit was brought by Elbert Ogle to recover for personal injuries sustained by him on April 28, 1925, when a street car of the Knoxville Power & Light Company crashed into a truck of the city of Knoxville upon which Ogle was riding, in the performance of his duty as a laborer for the city. Another at the time was driving the truck which had run into the track, located on the side of the street, and because the track was not filled in level with the street, the truck was unable to climb out and clear the track before the oncoming street car struck it.

It is shown that the driver of the truck, to avoid a collision with a Dodge touring car which was rapidly approaching it, drove his front and rear wheel on the right side of his truck over between the railing of the street car track. The ties of the track were exposed, and the railing was from four to five inches in height. The wheels of the truck carried a rubber tire of three or four inches in height, resting upon an iron rim. It had been raining and the street, rails and wheels were wet, so the driver was unable to climb out after getting over into the track, and the street car then at a distance of about 300 feet was approaching the truck at a rate of twenty-five to thirty miles per hour. The driver was not looking ahead but was engaged in conversation with a man standing at his side, and while he talked to the passenger he looked at him so he did not see the truck upon the track until within fifteen or ten feet of him, when he put on his brakes, but this was insufficient to stop the car within such a short distance, it being one of the large cars operated by the company. But immediately before striking the car, the plaintiff in error, Elbert Ogle, jumped from the truck in an attempt to land across the track, he being on the inside of the track, and clear the runway of the car, but while he was in the air the street car struck him, knocking him to the side of the track when he was able by crawling on his hands and knees to clear the passageway in order to avoid being again hit by the wreckage. The driver had put down the brakes and stopped his car and he and a man sitting in the middle had time to jump from the truck on the left of the truck without injury before the accident. Ogle had been outside of the city limits with two of his fellow workmen when the truck was ordered in, and they were on this journey and within the city limits when the accident occurred.

It is shown that the width of the street at this place, which is known as Schofield street, was about twenty feet and that the Dodge car was over in the street making it necessary for the truck to drive into the car track which was on the unimproved side of the street. The plaintiff in error said that the truck ran into the street car track about four hundred feet distant from the approaching car and that the driver had his attention directed to the driving of the car in an attempt to make the front wheel adhere to the railing and climb out of the track and over the rail but because the wheel and roadway

as well as the rail were damp the wheel refused to adhere until the time the street car was about fifteen feet when the driver saw it and shut down his brakes, stopping the car, and at this time Ogle jumped.

The principal question raised in the briefs of counsel is: did Ogle or not jump soon enough? Counsel insists that Ogle was guilty of contributory negligence in remaining in the truck after it had gone on the track, anticipating that the motorman of the street car would look in time to see the truck and stop the car, in view of the fact that Ogle testified that he would have had time to get out of the truck, after it went upon the track, in safety, the truck going only five or six miles an hour, had he attempted to get out when he first saw the street car approaching. The street car ran about three hundred feet when it struck the truck, and the motorman looked only when about fifteen or ten feet away. The driver did not sound the horn, nor did Ogle call his attention to the fact that the car was coming, but it is not insisted that Ogle was negligent in this, nor do we find that he was because the driver was doing all within his power to get the truck out of the place of danger up until the time when he saw that it would be impossible, when he stopped it and jumped out.

At the conclusion of the evidence of the plaintiff, the trial judge took the view that the plaintiff was guilty of proximate contributory negligence and directed a verdict in favor of the defendant. From the judgment entered in the case, the plaintiff has appealed and the error assigned is that the trial judge wrongfully directed a verdict, in view of the fact the plaintiff found himself in a perilous position and, therefore, if he made a wrong decision as to which course of action to follow to extricate himself, his decision under such circumstances should not and did not constitute proximate contributory negligence excusing the negligence of the defendant.

In view of this, we will quote the pertinent testimony picturing the action which took place at the time of the accident, first quoting the plaintiff Ogle:

"A. Yes sir, he was attemping to get it off until it got up right close to us when he stopped.

"Q. Who stopped? A. The driver of the truck.

"Q. Stopped what? A. Stopped the truck.

"Q. Then what did he do? A. We saw he wasn't going to stop and we jumped out.

"Q. Who jumped out? A. The driver at first and Burl Gibbs followed him and I jumped out on the other side. I had to jump right in front of the street car.

"Q. Why did you jump there? A. Only chance for me to get out.

"Q. Why didn't you stay in? A. Well, it looked too dangerous to me. It would have killed me if I had stayed in.

"Q. You saw the street car come on and run into the truck? A. Yes sir, run into it and knock it off.

"Q. Head-on, you mean? A. Yes, headed right into us.

"Q. Any effort made to check that car and stop it until it got up there, up where you say within ten feet of the truck? A. No sir.

"Q. Could you see the motorman all that distance until you got up there and you jumped? A. Yes, sir.

"Q. Now, when you jumped what happened to you? A. The street car struck me. First I jumped and it struck me while I was in the air, struck me right in the body.

"Q. What happened then? A. It knocked me down, it knocked me I guess ten feet, then it run on up at me and I run on out of the way of it on my hands and knees."

On cross-examination the witness testified:

"Q. You say the motorman when he came in your view—the street car was three hundred feet away and you say the motorman was looking to the right—looking to his right I mean? A. Yes sir.

"Q. And he continued to look to his right and didn't pay any attention to you fellows on the truck until the street car was within ten or fifteen feet of the truck? A. Yes sir.

"Q. And you saw him all the time? A. Yes.

"Q. And you noticed he didn't look at you or pay any attention to you? A. No sir.

"Q. The car was running from twenty-five to thirty miles an hour? A. That's what I guess it to be.

"Q. It kept on coming fast all the time? A. Yes sir.

"Q. You never did say anything to Beals about stopping the truck or to get out—I mean your driver? A. No, we kept thinking the motorman would stop the street car.

"Q. You kept relying upon the motorman to stop his street car, you never said anything to the driver or try to get out? A. No.

"Q. How fast was your truck running? A. It wasn't running very fast, it kept trying to get off of the track.

"Q. Right at the time you were struck how fast were you going? A. Five or ten miles an hour.

"Q. You could have gotten off of the truck without danger, couldn't you? A. A fellow could.

"Q. All you had to do was spring out? A. Yes—we kept thinking the motorman would stop or we would get off of the track but it was so deep we couldn't.

"Q. You kept thinking that until the street car was ten or fifteen feet of you and running twenty-five or thirty miles an hour? A. Yes.

"Q. And you never tried to save yourself until he got within ten or fifteen feet of you? A. We tried to get out of the way."

The witness Earnest Beal who was the driver of the truck said when asked:

"Q. Who was with you in the truck at the time of this accident? A. Burl Gibbs and Elbert Ogle.

"Q. Where were they with reference to the seat where you were? A. They were sitting on the right hand side of the seat from me, I was on the left hand side of the truck and they were sitting on the right.

"Q. What happened if anything before you had the accident? A. There was a car passing me and drove up pretty close to me.

"Q. What did you do when you met the car? A. Had to get on the car track to keep from hitting him.

"Q. Was the road wide or narrow? A. Narrow.

"Q. Do you know how wide it was at that place? A. Ten or twelve feet.

"Q. Outside of the street car track? A. Yes sir.

"Q. Was there room enough for the car and the truck you were driving to pass without you going on to the street car track? A. If he had laid over I could have but he was scrouging me and I had to do that or hit him.

"Q. Was the defendant's street car track laid in the street? A. Yes, the street car track was higher, it was awful high. I tried every way in the world after that car forced me on there to get out.

"Q. How long did you continue to try to get out there? A. I tried several times and I looked and saw the street car coming.

"Q. Saw it coming toward you head-on? A. Yes, the motorman was talking to some one in front—appeared to be talking to them—anyway he was looking towards them.

"Q. How far was he away when you first saw him, in your opinion, with his head turned to the right? A. Well, he was a right smart piece off when I first saw him.

"Q. How far was his car down there, how many feet from your car when you first saw him? A. I guess he was something like seventy-five feet. You mean when he saw me?

"Q. No, when you saw him? A. I saw him something like seventy-five feet.

"Q. What was being done by the motorman if anything to stop his car? A. Well, when he was I guess ten or twelve feet maybe of us he tried to stop, he was something like ten to twelve feet away when he put on his brakes to stop the car and of course that was too late, the car slid.

"Q. How fast was the car running? A. Pretty fast, twenty-five or thirty miles an hour.

"Q. What happened to you and the other two men that were on the front seat of your truck? A. I saw this motorman wasn't going to stop and we came out on this side.

"Q. You mean on the left side? A. Yes sir, and Elbert jumped off on the right hand side."

On cross-examination he answered:

"Q. When you first went on the track, did you see the street car coming then? A. No.

"Q. How far did you drive on the track before you started to pull out? A. As far as from here to that chair, I was trying to get out all the way down through there.

"Q. How far away from you was the street car when you saw it coming? A. My best knowledge, it was forty or fifty feet.

"Q. Away when you first saw it? A. Yes.

"Q. What was the matter you didn't see him coming sooner? A. I was trying to get the truck out.

"Q. You wasn't looking for him? A. I happened to look out and see this motorman. I seen he wasn't going to stop and me and the other helpers got off of the truck.

"Q. When was it you and he commenced unloading, when you first saw the street car, or did you continue to drive on? A. No, we came on and when we saw the motorman couldn't stop we got out.

"Q. How close was that street car up to your truck when you began to unload? A. As close as from here to that man there.

"Q. How far is that, ten feet? A. Something like that, I guess.

"Q. Now, then, up to that time all you all had done was to try to get out of the track? A. Yes.

"Q. When did you stop it and put on the emergency brake? A. When I saw this man wasn't going to stop.

"Q. When he was ten feet away you stopped and put on the emergency brake? A. No, the truck was stopped. I stopped the truck when I saw him off that distance. I was watching him, I saw I couldn't get out and I stopped the truck and I was watching him and saw he wasn't going to stop.

"Q. You stopped as soon as you saw him coming? A. Yes, I stopped.

"Q. You had plenty of time to get out before the car got down there if you had gotten out when the car first stopped, didn't you? A. Yes, but I thought sure the man would stop."

We think the facts to be drawn from the whole evidence is that the car was stopped and the parties immediately began to pile out. While the driver might give the impression he stopped the car and waited some little interval, yet the very testimony carries the thought that the whole transaction took place in a very short interval of time. It is from this evidence that the defendant in error insists that a case of liability has not been made out.

In counsel's statement to the lower court, in argument upon the motion for a directed verdict as his statement appears in the bill of exceptions, he admits that the street car company was negligent in

operating this car at the place of the accident at a high rate of speed and without keeping a lookout ahead, but he said the plaintiff had an opportunity to extricate himself from the place of danger by jumping sooner and since he did not do that but waited, relying upon the motorman to stop, until it was too late, he was guilty of such negligence as precluded his right of recovery.

The defendant in error cites and relies upon the case of Lawrence v. Fetchburg & Leominster Street Railway, 102 Mass., 489, as a case in point but in that case the error complained of was the failure of the lower court to charge a special request and not the act of the lower court in directing a verdict. This makes a material difference, although the facts may be strikingly similar. The special request which the trial judge refused reads as follows:

"If the plaintiffs saw the car approaching at a distance of five-hundred feet or more, upon a dark night, and knew they were in a position where the car could not pass without colliding with the automobile, and had ample time to remove from such position of danger, but remained in the same position, relying upon the expectation that the motorman would see them and stop the car before colliding with the automobile, then neither plaintiff can recover for personal injuries nor for any damages connected with, or growing out of, such personal injuries."

In the discussion of the case, the court said:

"Its true, as has been argued by the counsel for the plaintiff, that a plaintiff is not to be charged with negligence because of error of judgment, especially when the circumstances are such as to call for speedy decision and action. (Citing three cases). Nor is the testimony of the husband, that it would be dangerous for Mrs. Lawrence to leave the automobile when she first saw the car to be disregarded. But this, as we have already said, was not her view; for she assigned as the sole reason of her inaction her expectation that the car would stop. And the plaintiff's continued effort to crank his automobile was not due to any mistaken idea that he could thus get away with his wife and his machine before the car should strike them. He also trusted their safety to his hope that the motorman would look out for them and seasonably stop his car. . . . It is impossible to avoid conclusion that both of these plaintiffs chose to put all the responsibility for their personal safety upon the defendant's motorman. Upon their own testimony they made no attempt either to put themselves in safety or give any warning to the motorman, either by signal or out-cry or by running back, until it was too late to avoid the collision. It did not occur to them to act otherwise. They failed to take not only due care but any care. . . ."

From the discussion as above detailed, it is clear that the instant case and that case are not in all respects similar,—here the driver

was attempting to extricate himself and the plaintiff by driving off of the track and the plaintiff only jumped off when he saw the driver was not going to get the truck off and the motorman was not going to stop. Just when it was the duty of the plaintiff to jump, under the facts and circumstances of this case, is a question in the solution of which reasonable minds might differ.

But this case turns upon another question of law, conceding that it was the duty of the plaintiff to jump earlier. There is an exception to the last clear chance doctrine, to the effect that where defendants are engaged in certain hazardous businesses to the public, as that of operating dangerous instrumentalities, the law imposes the duty on the defendants to continually anticipate that some other might negligently subject himself to peril, and in such cases the contributory negligence of such other would not bar recovery but go only in mitigation. This doctrine is defined and explained in the case of Todd v. Railway, 135 Tenn. 105. The doctrine was recently applied by this court in the case of Wells v. Southern Railway, 1 Tenn. App., 691, the writ of certiorari being denied by the Supreme Court. We think this doctrine applicable to the facts of the instant case. The exception to the rule of the last clear chance doctrine is stated by Judge Williams in the Todd case as follows:

"Society is not always unconcerned as to whether the conduct of its members shall reach the standard of due care erected by the law; and that standard may tend to be attained by the assistance to be given or refused by society's judicial functionaries.

"It is on such considerations that cases composing an exceptional class have been determined. We refer to those instances where the defendant is engaged in a business hazardous to the public in certain aspects, such as that of operating dangerous instrumentalities, and where, therefore, the law imposes the duty on the defendant continuously to anticipate that some other (plaintiff) may negligently subject himself to a peril from defendant as a source; the latter having control of some instrumentality that has inherent potentiality of danger. Such a defendant is precedently, and continuously to the moment of injury, under the duty of lookout for the other, and his or its negligence in failing to discover the exposure of such a plaintiff and averting injury by the exercise of ordinary care is on grounds of policy considered to be proximate cause. The law in such case conceives of the negligence of the plaintiff as being remote; it may be in disregard of logic or of actual causation. It is assigned that status in the law's regard by reason of the policy of the law, though it may be that from the standpoint of actuality of cause the plaintiff's negligence is concurrent with the defendant's to the moment of injury. Teakle v. San Pedro, etc., R. Co., 32 Utah, 276, 90 Pac., 402, 10 L. R. A. (N. S.), 486; opinion of Ladd, J., in Bourrett v. Chicago, etc. R.

Co., 152 Iowa, 579, 132 N. W., 973, 36 L. R. A. (N. S.), 964; Patterson's Railroad Accident Law, 55.

"Mr. Thompson, in his work on Negligence (1 Thomp. Neg. (2 Ed.), section 232) referring to the doctrine of the above cited leading English cases, says in this connection:

"The doctrine can have no just application in any case, except where the person inflicting the injury was under the duty of exercising care to discover the exposed situation of the person receiving the injury. If this test is kept steadily in view, it will lead us out of many difficulties and prevent much confusion. The best illustration of the principle is found in the case of the engineer of a railway train on a railroad where there are grade crossings, or where the tracks run along a public street or highway, and where consequently human beings or animals are liable to get on the track. The engineer is driving the instrument of danger forward, generally at a high rate of speed. He is the actor, and the person or animal on the track is passive; he is therefore under a continuous duty of watchfullness . . . The sound principle then is that the defense of contributory negligence is not available where the defendant was guilty of a negligent act or omission subsequently to the time when he ought to have known that the negligence of the plaintiff or of the person injured had created a situation of peril." Todd v. Railroad, supra.

We think that the street car company using such dangerous instrumentalities upon the streets of the cities, constantly coming in contact with vehicles and pedestrians, owes a continuous duty to keep a lookout ahead when it operates its high power cars in the suburban districts. It can always expect to find vehicles or pedestrians upon its tracks and the doctrine as above defined is peculiarly applicable to street car companies.

Therefore, the circuit judge was in error in directing a verdict, notwithstanding the defendant may have been guilty of contributory negligence, for the reason that in such cases his negligence goes only in mitigation of his damages. The judgment of the lower court is reversed and the case is remanded for a new trial. The defendant in error will pay the cost of the appeal and of the lower court accruing on the first trial.

Snodgrass and Thompson, JJ., concur.